SBC COMMUNICATIONS INC.,
et al., Appellant,

v.

FEDERAL COMMUNICATIONS
COMMISSION, Appellee,

AT&T Corporation, et al., Intervenors.

No. 97–1425.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 9, 1998.

Decided March 20, 1998.

Appeal of an Order of the Federal Communications Commission.

Michael K. Kellogg argued the cause for appellants, with whom James D. Ellis, Robert M. Lynch, San Antonio, TX, and Martin E. Grambow, Washington, DC, were on the briefs.

Christopher J. Wright, General Counsel, Federal Communications Commission, argued the cause for appellee, with whom William E. Kennard, General Counsel, John E. Ingle, Deputy Associate General Counsel, and James M. Carr, Counsel, Washington, DC, were on the brief.

David W. Carpenter argued the cause for intervenors AT&T Corporation, et al., with whom Mark E. Haddad, Peter D. Keisler, Washington, DC, Mark C. Rosenblum, Roy E. Hoffinger, Basking Ridge, NJ, Anthony C. Epstein, Sue D. Blumenfeld, Washington, DC, Michael Finn, Leon Kestenbaum, Jay Keithley, Washington, DC, Charles C. Hunter, Catherine M. Hannan, Bowie, MD, Glenn B. Manishin, Washington, DC, Christy C. Kunn, John D. Windhausen, Jr., Silver Spring, MD, Gary M. Cohen, Jeffrey Blumenfeld, Genevieve Morelli, Alexandria, VA, Danny E. Adams, Steven A. Augustino, Washington, DC, Richard J. Metzger, Arlington, VA, Emily M. Williams, Daniel L. Brenner, Neal M. Goldberg, David L. Nicoll, Werner K. Hartenberger, Laura H. Phillips, and J.G. Harrington Washington, DC, were on the brief. Donald B. Verrilli, Jr. Washington, DC, entered an appearance.

Mickey S. Moon, Assistant Attorney General, State of Oklahoma, Oklahoma City, OK, was on the brief for intervenor Office of the Oklahoma Attorney General

Jeffrey W. Sarles, Chicago, IL, was on the brief for amicus curiae Ameritech Corporation.

James R. Young and Michael E. Glover, Arlington, VA, were on the brief for intervenors Bell Atlantic Telephone Companies and Bell Atlantic Communications, Inc.

Before: SILBERMAN, WILLIAMS, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellant SBC Communications contends that in denying its application to provide long-distance telephone service in the State of Oklahoma, the Federal Communications Commission has erroneously interpreted the provisions governing Bell operating company entry into the long-distance market in their home region states (to be codified at 47 U.S.C. § 271(c)(1)(A), (B)). We affirm.

## I.

SBC Communications provides local telephone exchange (intraLATA)[1] service in the States of Arkansas, California, Kansas, Missouri, Nevada, Oklahoma, and Texas through its subsidiaries Nevada Bell, Pacific Bell, and Southwestern Bell. It is a combination of local telephone companies that AT&T was required to divest pursuant to the Modification of Final Judgment (MFJ), a consent decree between the government and the then-integrated AT&T, as modified by the district court, in settlement of the Justice Department's 1974 antitrust suit. *See United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131, 227 (D.D.C.1982), *aff'd sub nom. Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).[2] Divestiture was called for, in large part, because it was thought "that a corporation that enjoyed a monopoly on local calls would ineluctably leverage that bottleneck control in the interexchange (long distance) market." *United States v. Western Elec. Co.*, 969 F.2d 1231, 1238 (D.C.Cir.1992). The newly independent Bell operating companies (BOCs) were given AT&T's local network assets, and thus control of the "bottleneck" monopoly (so named because interexchange calls are routed to homes through the local network). *See SBC Communications Inc., v. FCC*, 56 F.3d 1484, 1491 (D.C.Cir.1995).

Out of concern that the BOCs might similarly leverage that local monopoly to their competitive advantage, the MFJ forbad them from offering long-distance service. *See United States v. American Tel. & Tel. Co.*, 552 F.Supp. at 188 ("there are many ways in which the company controlling the local exchange monopoly could discriminate against competitors in the interexchange market"). The MFJ provided that the ban might be lifted if the BOCs lost their monopoly over local service, either by "technological developments" or "changes in the structures of competitive markets"; the Department of Justice was to report to the district court on whether the restriction continued to be necessary. *See id.* at 194–95. But subscriber plant equipment (also known as the "local loop")—inside wiring and equipment, and the wireline connecting each household to a local switching office, *see MCI Telecommunications Corp. v. FCC*, 750 F.2d 135, 137 (D.C.Cir.1984)—is very costly to install. And, state regulators helped sustain the BOCs' bottleneck control, arguably because they preferred the "subsidies and price-averages" the local monopoly allowed. *See* M. KELLOGG, ET AL., FEDERAL COMMUNICATIONS LAW 68 (1992). The Department of Justice, indeed, came to believe that "the BOCs' bottleneck monopolies persist[ed] primarily because of local regulation." *United States v. Western Elec. Co.*, 900 F.2d 283, 292 (D.C.Cir.1990) (per curiam). Nevertheless, the BOCs, with the FCC's support, moved in 1987 to have the interLATA restriction removed. We agreed with the government in opposition that "the BOCs failed to show that there was no substantial possibility that they could use their monopoly power to impede competition in the interexchange market." *Id.* at 301. The restriction remained in force for the duration of the MFJ.

The Congress—responding, in part, to the argument that competition in the huge telecommunications industry should no longer be governed by an antitrust consent decree administered by a single federal district judge, *see* S.REP. No.104–23, at 5, 9 (1995)—set forth a new legislative framework, the Telecommunications Act of 1996, Pub.L. No. 104–104, 110 Stat. 56 (1996). Section 601 of the

---

1. All former Bell System territory has been divided into Local Access and Transport Areas, or "LATAs." *See United States v. Western Elec. Co.*, 569 F.Supp. 990 (D.D.C.1983). InterLATA service refers to what consumers know as long-distance service; intraLATA to what they know as local service (although some intraLATA calls may be "toll" calls, depending upon classifications made by the state regulatory bodies). *See generally* M. KELLOGG, ET AL., FEDERAL COMMUNICATIONS LAW 227–34 (1992).

2. Under the approved reorganization plan, 22 of AT&T's 24 local telephone companies became what are known as the Bell operating companies (BOCs). The BOCs were consolidated into seven (as the result of mergers, now only five, *see Alarm Indus. Communications Comm. v. FCC*, 131 F.3d 1066, 1067 (D.C.Cir.1997)) regional holding companies (RBOCs), of which SBC is one. The remaining two local companies, in which AT&T owned a minority interest, became separate corporations. *See* H.R. REP. No. 104–204, pt. 1, at 48–49 (1995).

Act provided that the "restrictions and obligations imposed" by the MFJ were to give way (the district judge terminated the MFJ as of February 8, 1996, *see United States v. Western Elec. Co.*, 1996 WL 255904 (D.D.C. Apr.11, 1996)). Congress hoped the Act would "provide for a pro-competitive, deregulatory national policy framework ... by opening all telecommunications markets to competition." H.R. CONF. REP. No. 104–458, at 1 (1996). The question of how best to achieve that goal, however, was the subject of great debate. Some thought that the local and long-distance markets should be open to all competitors immediately. Others believed that the BOCs should have to wait until actual competition was introduced in their local markets before providing inter-LATA service, since it was claimed that the long-distance market is already competitive. As might be expected for an issue of this economic significance, an extended lobbying struggle ensued. The end product was a compromise between the competing factions.

States and localities were no longer to sanction local monopolies; they are now barred from "prohibiting the ability of any entity to provide ... intrastate telecommunications service." 47 U.S.C.A. § 253(a) (West Supp.1997). The BOCs are obliged to provide any requesting carrier with nondiscriminatory interconnection to their networks and nondiscriminatory access to unbundled network elements at reasonable rates, terms, and conditions; they must also offer telecommunications services at wholesale rates for resale to end users. 47 U.S.C.A. § 251(c).[3]

Interexchange carriers may immediately begin providing local telephone service, and the BOCs may provide longdistance service originating from out-of-region[4] states without the FCC's approval. *See id.* at

§ 271(b)(2). A BOC must apply to the Commission, however, for authorization to provide interLATA services in any of its in-region states under section 271(d)(1). In evaluating any such application, the FCC must consult with the United States Attorney General and the relevant State commission, *see id.* at § 271(d)(2), and must approve or deny the application within 90 days of receipt. *See id.* at § 271(d)(3). The FCC may not approve a BOC's request unless it finds that the criteria set forth at 47 U.S.C.A. § 271(d)(3) are satisfied.

As the first step in meeting the section 271(d)(3) criteria, the BOCs must satisfy either 47 U.S.C.A. § 271(c)(1)(A) or 47 U.S.C.A. § 271(c)(1)(B), which the parties refer to as "Track A" and "Track B," respectively.[5] Track A provides:

A [BOC] meets the requirements of this subparagraph if it has entered into one or more [approved] binding agreements ... specifying the terms and conditions under which the [BOC] is providing access and interconnection to its network facilities for the network facilities of one or more unaffiliated *competing providers* of telephone exchange service ... to *residential and business* subscribers. For the purpose of this subparagraph, such telephone exchange service may be offered by such competing providers either exclusively *over their own telephone exchange service facilities* or predominantly over their own telephone exchange service facilities in combination with the resale of the telecommunications services of another carrier.

47 U.S.C.A. § 271(c)(1)(A) (emphasis added). Put simply then, Track A visualizes a demonstration of a competitor in the local exchange market. Track B, which first became avail-

3. The Commission's regulations implementing these provisions were upheld in part in *Iowa Utilities Board v. FCC*, 120 F.3d 753 (8th Cir. 1997), *cert. granted*, —— U.S. ——, 118 S.Ct. 879, 139 L.Ed.2d 867 (1998).

4. A particular state is "in-region" if it is one of the states in which the RBOC controls a local bottleneck—in SBC's case, the States of Arkansas, California, Kansas, Missouri, Nevada, Oklahoma, and Texas. *See* 47 U.S.C.A. § 271(i)(1).

5. The Commission must also determine that: (1) the petitioning BOC has complied with the so-called "competitive checklist" set forth at 47 U.S.C.A. § 271(c)(2)(B), designed to ensure that the BOC is providing access and interconnection of a particular sort; (2) the BOC's requested authorization will be carried out by a separate subsidiary and otherwise in accordance with 47 U.S.C.A. § 272; and (3) granting the application would be in the "public interest, convenience, and necessity." *See* 47 U.S.C.A. § 271(d)(3)(A)-(C).

able 10 months after the date of enactment (*i.e.*, on Dec. 8, 1996), is satisfied, on the other hand, if "3 months before ... the [BOC] makes its application" to the FCC, "no such provider has requested the access and interconnection described" in Track A, so long as "a statement of the terms and conditions that the [BOC] generally offers to provide such access and interconnection has been approved or permitted to take effect by the State commission." 47 U.S.C.A. § 271(c)(1)(B). As is apparent, Track B is only available to a BOC as a default mechanism if "no such provider" has requested the access and interconnection Track A contemplates. Just what the characteristics of *such* a provider are and how they are measured— in other words, how useful is Track B to the BOC's—is the key issue in this litigation.

On April 11, 1997, SBC applied to the Commission for authorization to provide interLATA service originating from its in-region State of Oklahoma. Prior to submitting its application, SBC received the Oklahoma Corporation Commission's (OCC) approval of several negotiated access and interconnection agreements, one of which was made with Brooks Fiber Communications. Before the FCC, SBC contended that it satisfied Track A by virtue of its agreement with Brooks. At the time SBC made its application, Brooks owned and operated local telecommunications networks in Tulsa and Oklahoma City, providing service to 20 business customers (13 in Oklahoma City and 7 in Tulsa), and to three Tulsa residents and one other residential customer—each a Brooks employee. This service alone, SBC urged, meant that Brooks qualified as a Track A provider. To bolster its argument, SBC claimed that the tariff Brooks had filed with the OCC obligated Brooks, under Oklahoma law, to provide residential service over its own facilities to any requesting customer in its areas of operation. The OCC had cryptically opined

that SBC had satisfied Track A's requirements, and SBC argued that the FCC was obliged to defer to the OCC's decision.

Alternatively, SBC claimed that it satisfied Track B because if the Commission determined that Brooks did not qualify as a Track A provider, neither did any other carrier. (SBC had filed a statement of terms and conditions at which it offered access and interconnection generally, which the OCC allowed to take effect by failing to complete its review within the 60 day requirement imposed by the Act. *See* 47 U.S.C.A. § 252(f)(3).) As it happened, a large number of carriers had "requested" access and interconnection agreements of the sort described in Track A, but none of those requests foreclosed Track B's availability to SBC because SBC interpreted the phrase "such provider" to mean a competing local exchange carrier that was *already* providing the kind of service described in Track A—local telephone service to residential and business subscribers exclusively or predominantly over its own facilities based network—at the time it made its request. SBC acknowledged an exception, however, for a requesting carrier who did not have that position at the time of its request but nevertheless achieved it no later than three months *before* the BOC applied to the FCC for interLATA authorization.[6]

The Commission concluded that appellant had not yet met either Track A or Track B and denied SBC's application. *Application by SBC Communications Inc., Pursuant to Section 271 of the Communications Act of 1934, as amended, to Provide In–Region, InterLATA Services in Oklahoma (Oklahoma Application)*, 12 F.C.C.R. 8685, at ¶¶ 2, 68 (1997). Regarding Track A, the FCC concluded that Brooks—the only potentially Track A satisfying provider that SBC identified—was not a competing provider of telephone exchange service to residential subscribers.[7] The Commission construed Track

---

**6.** That exception to SBC's general interpretation helps SBC to claim that Brooks was a Track A provider although it had not been providing all of its relied upon service at the time it made its request. According to SBC, although Brooks did not qualify when it submitted its request in March 1996, it began providing service of the kind described in Track A on January 15, 1997.

Since SBC had made its application on April 11 of that year, Brooks became "such provider" a few days too late to foreclose Track B.

**7.** Given this conclusion, the FCC thought it "unnecessary to reach the issue of whether Brooks [was] a competing provider of telephone ex-

A's phrase "competing provider" to mean that there be an "actual commercial alternative to the BOC." *Oklahoma Application* at ¶ 14. Since the four customers to which Brooks provided residential service were its employees, and the service was provided on a test basis free of charge, Brooks did not qualify. A *"competing* provider must actually be in the market, and, therefore, beyond the testing phase." *Id.* at ¶ 17. The Commission also concluded that the terms "telephone exchange service" and "subscribers" as used in Track A meant that the persons receiving the service had to pay for it. *Id.*

The FCC acknowledged its obligation to consult with the State commissions, but pointed out that the Act is silent as to how much weight it should place on the advice it receives. As the "expert agency charged with implementing" the statute, the Commission decided that it was required to make an independent determination on the matter. *Id.* at ¶ 15. It thought the OCC's recommendation unpersuasive because the OCC failed to provide the basis or reasoning in support of its decision. *Id.* at ¶ 16. The Commission then determined that whatever legal obligations Brooks had under Oklahoma law, those obligations could not supply evidence of actual competition. Brooks' own executive vice president had averred that Brooks was "'not now offering ... nor had it ever offered residential service in Oklahoma.'" *Id.* at ¶ 18 (quoting affidavit of John C. Shapleigh). And because it lacked the necessary facilities, Brooks was not "'accepting any request in Oklahoma for residential service.'" *Id.* Accordingly, the Commission said Brooks "at present has at most paper commitments to furnish service." *Id.* at ¶ 14. In reaching this conclusion, the Commission explicitly relied upon the comments of the United States Department of Justice, whose recommendations the FCC must give "substantial weight." *See* 47 U.S.C.A. § 271(d)(2)(A).

The Commission went on to decide that Track B was not open to SBC. The Commis-

sion understood Track B to be foreclosed to a BOC if a provider had made a request that *if implemented* would satisfy Track A. The phrase "such provider" was not limited, as SBC claimed, to a provider who was already providing the very service contemplated at the time of its request (or one who achieved that status three months before a BOC's application), but rather included one who after implementation of its requested access and interconnection agreement would be a competitor. The Commission recognized, to be sure, that whether such a request satisfied this standard was a potentially difficult question that obliged the Commission to rely on its predictive judgment as an expert agency. *See id.* at ¶ 57. On the record before it, the Commission found that SBC had received 45 requests for interconnection, *id.* at ¶ 62; "at the very least, ... several [of which were] qualifying requests for access and interconnection that foreclose[d] Track B." *Id.* at ¶ 61. The Commission identified four of the requesting carriers—Brooks, Cox Communications, Inc., ICG Telecom Group, Inc., and U.S. Long Distance—as having made interconnection agreements that if implemented would satisfy Track A, *id.* at ¶ 62; two of which—Brooks and Cox—had "already taken affirmative steps to enter the residential and business local exchange markets." *Id.* at ¶ 63.[8]

The FCC rejected SBC's narrow reading of "such provider" in Track B, primarily because under that interpretation, BOCs would have a considerable incentive to delay and prevent interconnection so that they could apply under Track B immediately on December 8, 1996. *See id.* at ¶ 29. The Commission thought that "Congress intended Track B to serve as a limited exception to the Track A requirement of operational competition," *id.* at ¶ 46, and believed that its reading "best further[ed] Congress' goal of introducing competition in the local exchange market by giving BOCs an incentive to cooperate with potential competitors in providing them the

---

change service to *business* subscribers." *Oklahoma Application* at ¶ 13.

**8.** The Commission noted that SBC did not dispute that the requests it had received would

"lead to the type of telephone exchange service described in [Track A]," preferring to rest upon its interpretation of Track B. *Id.* at ¶ 60.

facilities they need to fulfill their requests for access and interconnection." *Id.* at ¶ 28. The Commission also discarded what it called the "equally unreasonable" position advanced by SBC's potential competitors—that *"any* request for access and interconnection submitted by a potential new entrant to a BOC is a qualifying request [that] precludes the BOC from proceeding under Track B"—as that interpretation would allow potential competitors to effectively deny the BOC's entry into the interLATA market by submitting requests that might *never* satisfy Track A even if implemented. *Id.* at ¶ 29.

After deciding that SBC could not satisfy either Track A or Track B, the FCC declined to address whether SBC's application could satisfy the remainder of section 271(d)'s requirements. *See id.* at ¶ 65. SBC appealed, and we have exclusive jurisdiction to hear that appeal under 47 U.S.C.A. § 402(b)(9).

## II.

SBC reiterates its statutory interpretation arguments before us, but alternatively argues that even if the Commission permissibly construed both Tracks A and B, it was arbitrary and capricious not to go on to determine whether SBC's application otherwise satisfied the requirements of section 271(d)(3), *see supra* note 5, so that at least appellant would have adequate guidance.

### Track A

█ We do not think much of appellant's argument that the Commission was obliged to conclude that Brooks was a "competing provider" in the local residential market merely because four Brooks employees were provided free residential service and under Brooks' tariff it is legally bound to offer such service. Track A does not indicate just how much competition a provider must offer in either the business or residential markets before it is deemed a "competing" provider. Nor does the legislative history offer any guidance. Under those circumstances, the Commission's interpretation of the ambigu-

ous phrase "competing provider" is certainly entitled to *Chevron* [9] deference.

█ It is at least permissible, within the meaning of *Chevron* Step II, for the Commission to interpret "competing provider" as meaning that a Track A satisfying provider must offer "an actual commercial alternative to the BOC." *Oklahoma Application* at ¶ 14. Indeed, we doubt that appellant's interpretation, even if adopted by the Commission, would be thought reasonable. Test service provided to only four employees is hardly a commercial alternative, and Brooks was *not* accepting requests for further residential service in Oklahoma. *Id.* at ¶ 18. SBC nevertheless insists that Brooks is required, by virtue of its tariff, to offer local residential service to all who request it. We cannot quarrel, however, with the FCC's conclusion that before a competing local carrier is deemed to offer "an actual commercial alternative," it must have more than "at most paper commitments to furnish service." *Id.* at ¶ 14. The Commission reasonably interprets the statute to mean that it must ask not whether Brooks is *required* to provide residential service under state law (which, incidentally, intervenor Office of the Oklahoma Attorney General disputes), but rather whether Brooks was *in fact* providing such service at the time SBC made its application.

█ Nor is the Commission obliged to defer to the OCC's judgment that SBC satisfied Track A. Although the Commission must consult with the State commissions, the statute does not require the FCC to give the State commissions' views any particular weight. Unless the FCC concludes to its own satisfaction that the applying BOC has satisfied either Track A or Track B, as well as the other statutory requirements, it "shall not approve the authorization." 47 U.S.C.A. § 271(d)(3). *Louisiana Public Service Commission v. FCC,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986), which holds that matters in connection with intrastate service are "fence[d] off from FCC reach," simply does not apply in this case. Congress has clearly charged the FCC, and not the State commis-

---

**9.** *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

sions, with deciding the merits of the BOCs' requests for interLATA authorization, and interLATA service is typically *interstate.* For these reasons, we uphold the Commission's determination that SBC's application did not satisfy Track A's requirements.[10]

Track B

█ Since appellant's argument is primarily a linguistic one, we think it useful to set forth section 271(c)(1)(B) in its entirety.

(B) FAILURE TO REQUEST ACCESS. A Bell operating company meets the require- ments of this subparagraph if, after 10 months after February 8, 1996, no *such provider* has requested the access and in- terconnection described in subparagraph (A) before the date which is 3 months before the date the company makes its application under subsection (d)(1) of this section, and a statement of the terms and conditions that the company generally of- fers to provide such access and intercon- nection has been approved or permitted to take effect by the State commission under section 252(f) of this title. For purposes of this subparagraph, a Bell operating compa- ny shall be considered not to have received any request for access and interconnection if the State commission of such State certi- fies that the only provider or providers making such a request have (i) failed to negotiate in good faith as required by sec- tion 252 of this title, or (ii) violated the terms of an agreement approved under section 252 of this title by the provider's failure to comply, within a reasonable peri- od of time, with the implementation sched- ule contained in such agreement.

47 U.S.C.A. § 271(c)(1)(B) (emphasis added).

Appellant contends that because the phrase "such provider" in Track B necessari- ly refers back to the *"competing* providers" in Track A, Track B must be available to a BOC unless an actual competing provider is on the scene and has requested or entered into binding agreements with a BOC to pro-

vide access and interconnection. In SBC's view, it will be recalled, Track B can only be foreclosed if a requesting provider has begun competing in the local telephone market over its own facilities-based network *before* even asking for an access and interconnection, *or,* alternatively, if the requesting provider be- comes an actual facilities-based competitor at least three months before the BOC makes its application to provide interLATA service (of course, at that point it would not matter if Track B were foreclosed to the BOC because Track A would be available). If the Commis- sion is correct in determining that Brooks is not "such a provider" because it is not suffi- ciently competitive, then it follows, according to appellant—since no other carrier is claimed to have achieved greater competitive status—that Track B is open to SBC. As we have noted, the Commission read "such pro- vider" differently; it thought that Track B was foreclosed the moment a provider re- quested interconnection so long as it could predict that the carrier would, after imple- menting the agreement, provide competitive service to both residential and business cus- tomers, at least predominantly over its own facilities.

Regardless of which of these two interpre- tations is correct, the Commission would still have authority to determine whether a BOC met the other section 271(d)(3) criteria, in- cluding whether a BOC's entry into the inter- exchange market in an in-region state was in the public interest. Still, appellant, interve- nors, *amicus,* and the Commission regard this threshold question as of great signifi- cance. Appellant argues that the Commis- sion's interpretation makes Track B virtually useless to BOCs because of the flood of interconnection requests. The record showed that SBC received 45 such requests in Oklahoma, and the Commission concluded that four of those would meet the facilities- based competitive standard after being im- plemented.[11] And SBC asserts that it does

---

10. We need not consider whether, as SBC ar- gues, free service provided to a customer can be "telephone exchange service" or that a customer receiving such service is a "subscriber" within the meaning of the statute.

11. In making this prediction, the FCC must have at least implicitly determined that the four pro- viders would satisfy Track A's facilities-based re- quirement. Yet, what it means for a carrier to offer service "exclusively ... or predominantly over their own telephone exchange service facili-

not know of any state where no carrier expressing a desire to become a facilities-based competitor requested interconnection. The Commission, on the other hand, contends that appellant's reading would nullify Track A, which it believes Congress intended as the primary path for a BOC seeking to enter the interLATA market.

Carefully parsing the language of the two sections, we come to the conclusion that it is not apparent on their face whether "such provider" in Track B is intended to mean a carrier who has *met* the requirements of Track A—*i.e.*, is actually providing service, either on its own, or under an access and interconnection agreement with a BOC—or one who has requested such an agreement but has not yet implemented it and begun providing the requisite service. There seems to be an ambiguity as to how close to competitive status a provider must be when the request is made.

We do see an immediate weakness in appellant's argument. SBC's basic contention—that the statute requires the characteristics of "such providers" to be measured at the time they make their requests—is considerably undermined by its concession that a provider such as Brooks can gain the requisite characteristics and foreclose Track B's availability *after* it makes a request, so long as that occurs at least three months before the date that the BOC makes its application. It would be one thing for appellant to argue that the term "such provider" must refer to a provider with the characteristics described in Track A *at* the time it makes its request. Under that construction, the statutory requirement that it make its request "3 months before" the BOC makes its application would be an added condition. But by construing the three months clause as an exception to its basic contention, SBC destroys the linguistic coherence of its argument, and instead simply illustrates Track B's ambiguity concerning the time as of which the charac-

teristics of "such provider" are to be assessed.

The Commission's counsel argued that the draftsmen's words were deliberately and specifically intended to lead to the Commission's interpretation. He noted that in Track A, after setting forth the competing provider requirement, that subsection then states "such telephone exchange service may be offered by *such competing providers* either exclusively ... or predominantly over their own telephone exchange service facilities." 47 U.S.C.A. § 271(c)(1)(A) (emphasis added). But in Track B, the word "competing" is omitted between "such" and "provider." That omission indicated that Congress did not require that a requesting carrier be a competing provider at the time it made the request. Appellant protests that this argument is not made in the Commission's decision and therefore should be disregarded. Alternatively, it offers an explanation: the omission of "competing" in Track B was *necessary* to incorporate Track A's requirements that the provider not only be competing but also be facilities-based. In Track A, "such competing provider" is used to identify which providers must provide service over their own facilities. If Track B had said "such competing provider," Track B may have incorporated only Track A's competitive requirements, to the exclusion of the facilities-based requirement.

■ Appellant is of course correct that we do not normally accept counsel's post hoc rationalizations. This principle, grounded in the reasoning of *SEC v. Chenery Corporation*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), requires that courts adjudicate agency actions based solely on the grounds relied upon by the agency. Nevertheless, we must determine on our own whether the statute is ambiguous without regard to the FCC's reasoning, see *Rettig v. Pension Benefit Guar. Corp.*, 744 F.2d 133,

---

ties," 47 U.S.C.A. § 271(c)(1)(A), is nowhere spelled out in the text or by the Commission (it is clear that pure "resale of the BOC's telephone exchange service does not qualify," H.R. Conf. Rep. No. 104–458, at 148). Indeed, the FCC claimed not to have addressed the issue. *Okla-*

*homa Application* at ¶ 22. We are puzzled by the FCC's reasoning, but no party has raised this point, so the FCC's interpretation of what it means to be predominantly facilities-based remains for another case.

141 (D.C.Cir.1984), and we take counsel's point as an added indication of ambiguity, if not support for the Commission's interpretation.

Looking further to the structure of the sections to understand their meaning, we see that Track B provides that a BOC will be deemed not to have received an interconnection request if a State commission determines that a requesting provider negotiated in bad faith or violated the terms of an interconnection agreement by delaying its implementation unreasonably. We think that provision supports the Commission's interpretation. As should be apparent, the BOCs have an incentive to protect their local markets from competition, just as the long-distance carriers have one to prevent the BOCs from entering the interexchange market. The bad faith and unreasonable delay exceptions explicitly contemplate and seek to deal with the problem that SBC identifies—that a provider might request interconnection only to prevent a BOC from using Track B. If SBC's reading of the statute were correct, a BOC, merely by refusing to enter into an interconnection agreement, could easily prevent a competing facilities-based provider from emerging, thus preserving Track B's availability. To be sure, another provision of the statute obliges the BOCs (as well as requesting carriers) to negotiate access and interconnection agreements in good faith. *See* 47 U.S.C.A. § 251(c)(1). But only the requesting carriers are penalized for negotiating in bad faith in the Track A and B subsections; there is no reciprocal provision that prevents a BOC from using Track B if it in bad faith refused to allow interconnection. Under SBC's reading, the draftsmen would have left an inexplicable loophole in the legislative scheme, one inconsistent with the treatment of requesting providers acting in bad faith.

The Track B exceptions clause poses another difficulty with SBC's interpretation of "such provider." As the Commission pointed out in its order, the very inclusion of the Track B exceptions for a requester's bad faith or unreasonable delay is an indication that Congress thought "there would be a period during which good-faith negotiations

are taking place, interconnection agreements are being reached, and the potential competitors are becoming operational by implementing their agreements." *Oklahoma Application* at ¶ 45. Under SBC's alternative reading, as the Commission observes, this process would have to occur in the first seven months from the date of enactment (assuming the BOC requested in-region interLATA authorization at its first opportunity, on December 8, 1996). *Id.* at ¶ 53. Even supposing that there were competitors able to provide the facilities-based service Track A contemplates *without* an access and interconnection agreement, as SBC surmises, those providers "would need interconnection from the BOC prior to becoming operational in order to complete calls to, and receive calls originating from, BOC customers." *Id.* at ¶ 33. SBC appears to have conceded as much before the Commission, where it argued that providers "would be full competitors in the local market only after they implement interconnection agreements." It seems unlikely that Congress would have seen the need to include the Track B exceptions had it thought that the negotiation and implementation of agreements would take substantially less than seven months, especially given that Congress gave the FCC six months to promulgate regulations implementing the Act's interconnection requirements. *See* 47 U.S.C.A. § 251(d)(1). If Congress really meant for Track B to be readily available to the BOCs after 10 months, as SBC contends, it is very difficult to see why the exceptions clause would be included at all.

Appellant and *amicus* Ameritech Corporation vigorously protest that Track B's device to protect it against the possible bad faith and unreasonable delay of requesting providers is palpably inadequate for two reasons. First, the unreasonable delay clause is worthless unless the BOCs are entitled to insist that a requesting carrier negotiate an implementation schedule as part of its access and interconnection agreement (Ameritech seems to go so far as to argue that when an agreement with a requesting provider does not include an implementation schedule, the requesting provider is necessarily delaying implementation unreasonably). We think the

BOCs make a good point; denial of such freedom to the BOCs would undermine the reasonableness of the FCC's interpretation. But the Commission appears to agree. In its order, the Commission said that the "BOCs are free to negotiate implementation schedules for their interconnection agreements." *Oklahoma Application* at ¶ 37 n. 109. And the FCC noted further that "nothing in the Commission's rules precludes [the BOCs] from negotiating, or states from imposing in arbitration, schedules for the implementation of the terms and conditions by the parties to the agreement." *Id.*[12] SBC also argues that there could be a number of requesting providers who qualify under the Commission's predictive appraisal, and it is unduly burdensome to show that each is acting in bad faith. It should be remembered, however, that the determination of whether requesting carriers are negotiating in bad faith or unreasonable delaying implementation of their agreements is solely in the hands of the State commissions, which traditionally have not been hostile to the BOCs. In any event, this argument does not really go to congressional purpose as revealed by the structure of the statute but rather to the adequacy of the remedy Congress provided.

At bottom, appellant's reading of Track B rests on its contention, drawn from the legislative history, that Congress understood that there were carriers in existence at the time the statute was passed which were actually competing in the local exchange market, or at least that requesting carriers would quickly become facilities-based competitors, before a BOC was first eligible to file under Track B. In support of the first proposition, SBC points to the Conference Report's acknowledgment that Cablevision and New York Telephone had entered into an interconnection agreement. H.R. CONF. REP. No. 104–458, at 148. As the Commission noted in its order, "it is not obvious from this reference in the legislative history whether Cablevision either actually provided telephone exchange service to both residential and business sub-scribers on the date of enactment or intended to do so in the future." *Oklahoma Application* at ¶ 51. Congress did not find that there were actual competitors in the local market. If anything, the legislative history suggests the opposite; Track B "is intended to ensure that a BOC is not effectively prevented from seeking entry into the inter-LATA services market simply because no facilities-based competitor that meets the criteria set out in [Track A] has *sought to enter the market.*" H.R. CONF. REP. No. 104–458, at 148 (emphasis added).

Nor is there much support for SBC's alternative contention that the Congress expected cable companies and others to quickly fill the role. Although there was mention of the possibility that cable companies could provide meaningful facilities-based competition in the Conference Report, *id.*, we see no indication that the Congress believed that cable companies, or anyone else, had such near term capability. While SBC argues that competition in the local exchange market has emerged in nine states since the Act became law, it can point to only one such provider—Brooks in the State of Michigan—as one that satisfies the facilities-based competitive requirements of Track A. Even if Congress thought facilities-based competition existed or at least would develop quickly in nine states, we doubt that it would have ignored conditions in the remaining states and enacted Track B so as to permit the BOCs to successfully apply to provide interLATA service in those states after December 8, 1996, when the 10 month moratorium that section provides had elapsed.

In truth, neither the statute itself nor the legislative history focuses specifically on the issue this case presents. If the draftsmen had so focused, it seems to us quite unlikely that the language of Track B would have been written as it was. Indeed, it is flatly inconceivable to us that a competent draftsman would have chosen the language of Track B if he or she had consciously intended SBC's interpretation. It would have been all

---

12. At oral argument, FCC's counsel stated that the General Counsel's Office agreed with SBC's reading. Counsel for intervenor AT&T, *et al.* agreed that "the Commission made it very explicit that the BOCs can get implementation schedules and if they are violated [the] BOCs would then qualify for Track B." He also agreed that Congress included this provision to address "their concern that long distance carriers and others would hold back."

too easy to have said something more than "such provider" to make clear that this referred to a provider who at the time of its request (or some specific later date) had satisfied the Track A criteria.[13] Track B, like Track A, is ambiguous and therefore under *Chevron* we must give deference to the Commission's interpretation if it is a permissible reading. We have no doubt that it passes that test; it may again be the only reasonable interpretation.

\* \* \* \*

 There remains appellant's argument that the Commission was arbitrary and capricious in not proceeding to give it more guidance—and certainty—by determining whether, in the event SBC had satisfied Track A or B, it would also have met the balance of the section 271(d) criteria—the so-called competitive checklist, the separate affiliate requirement, and the public interest standard. Although we can well understand SBC's desire for clarity as to the criteria it must meet, we do not see how a reviewing court can fault the Commission for refusing to answer what on this record could be thought a hypothetical question. Inherent in an agency's ability to choose adjudication rather than rulemaking, *see SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), is the option to make policy choices in small steps, and only as a case obliges it to. For similar reasons, we reject *amicus* Ameritech's complaint that the FCC's use of its predictive judgment to determine whether a requesting provider would be a real competitor if it implemented its interconnection agreement is too imprecise a standard. Ameritech and appellant's complaint that it will be too great a burden on the BOCs to show, at the time they apply for interLATA authorization, that none of many requestors could qualify after implementation likewise fails. These contentions boil down to the proposition that the Commission cannot be trusted to fairly implement the statute to draw an acceptable balance between the interests of the BOCs in breaking

out into the interexchange market and the interests of the interexchange carriers in delaying that eventuality. The Commission, to be sure, has on occasion engaged in unprincipled decisionmaking when its policy or political inclinations came into conflict with legal restraints, *see, e.g., Bechtel v. FCC*, 10 F.3d 875 (D.C.Cir.1993); *Bechtel v. FCC*, 957 F.2d 873 (D.C.Cir.1992); *Meredith Corp. v. FCC*, 809 F.2d 863 (D.C.Cir.1987), and this has been so even in the telecommunications field. *See American Tel. & Tel. Co. v. FCC*, 978 F.2d 727 (D.C.Cir.1992). Still, Congress quite clearly gave the Commission the primary responsibility to make delicate judgments under this statute and we may not presume that the Commission will perform that task in bad faith. The Commission's order is *affirmed.*

---

13. As the issue was so heavily lobbied on both sides with the support of quite competent lawyers, we must assume that this ambiguity was noticed, but for an undisclosed reason, not addressed in the drafting stage.