**U S WEST COMMUNICATIONS, INC., et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COM-MISSION and United States of America, Respondents.**

**AT&T Corporation, et al., Intervenors.**

**Nos. 98–1468, 98–1469 and 98–1471.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 3, 1999.

Decided June 8, 1999.

William T. Lake argued the cause for petitioners U S WEST Communications, Inc., and Ameritech Corporation. With him on the briefs were William R. Richardson, Jr., Lynn R. Charytan, Theodore A. Livingston, John E. Muench and Kaspar J. Stoffelmayr.

Drew S. Days, III, argued the cause for petitioner Qwest Communications Corporation. With him on the briefs was Robert H. Loeffler. Kenneth W. Irvin entered an appearance.

Richard K. Welch, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Catherine G. O'Sullivan and Adam D. Hirsh, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, Daniel M. Armstrong, Associate General Counsel, and John E. Ingle, Deputy Associate General Counsel.

David W. Carpenter argued the cause for intervenors AT&T Corporation, et al.

With him on the brief were Peter D. Keisler, Mark C. Rosenblum, Roy E. Hoffinger, William Single, IV, Jerome L. Epstein, Donald B. Verrilli, Jr., Howard J. Symons, Sara F. Seidman, Albert H. Kramer, Andrew D. Lipman, Richard M. Rindler, W. Anthony Fitch, Brian Conboy, Thomas Jones and Robert M. McDowell. Genevieve Morelli and Michael J. Shortley, III, entered appearances.

John Thorne, Michael E. Glover, Mark L. Evans and M. Robert Sutherland were on the brief for amici curiae Bell Atlantic Telephone Companies.

Before: SILBERMAN, WILLIAMS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Until various conditions relating to competition in local ("intraLATA") telephone service are satisfied, the Telecommunications Act of 1996 generally bars each Bell operating company ("BOC") from providing long distance ("interLATA") service originating in the region where it provides local service:

> Neither a Bell operating company, nor any affiliate of a Bell operating company, may provide interLATA services except as provided in this section.

§ 271(a) of the Communications Act, 47 U.S.C. § 271(a).

In May 1998 two of the BOCs, U S WEST and Ameritech, announced deals with Qwest Communications Corporation under which each BOC would market Qwest's long distance service to its customers. Each BOC employed a special label for the resulting package ("Buyer's Advantage" for U S WEST, "CompleteAccess" for Ameritech); each offered the customer "one-stop shopping" for both local and long distance, with all customer support (sign-up and servicing) through the BOC's own toll-free number. Qwest was to compensate each BOC with a fixed fee for every customer obtained.

Competitors of Qwest in the long distance market filed complaints in two federal district courts, which referred them to the FCC. The Commission invited the filing of administrative complaints, which duly followed. The Commission held adjudicative proceedings and ultimately issued the order under review here, finding the agreements in violation of § 271. *AT&T Corp. v. Ameritech Corp.*, 13 FCC Rcd 21,438 (1998). U S WEST, Ameritech, and Qwest petitioned for review.

The statutory term "provide" appears to us somewhat ambiguous in the present context. The Commission believes that the disputed arrangements would give the two BOCs positions in the market for local and long distance service that would greatly advantage them once they become explicitly entitled to provide long distance service. Given the reasonableness of that belief, and its relation to the overall purposes of the Act, we find the Commission's interpretation here permissible.

\* \* \*

As we said, § 271 says that a BOC may not "provide interLATA services except as provided in this section." Exceptions in the Act allow several forms of interLATA service immediately; the rest—including the sort of service at issue here—is permitted, on a state-by-state basis, only upon application and FCC approval pursuant to § 271(d). See generally *SBC Communications Inc. v. FCC*, 138 F.3d 410, 412–14 (D.C.Cir.1998) (explaining history and structure of § 271(c)(d)). Neither U S WEST nor Ameritech has received § 271(d) approval for any state: each is therefore subject to the general § 271(a) prohibition.

Under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we of course honor Congress's clearly expressed answer to the "question" confronted by the agency. See *id.* at 842–43. Petitioners claim that § 271(a)'s ban clearly cannot apply to *any* marketing arrangements; as the two Qwest arrangements are a form of marketing, they rea-

son that the Commission necessarily erred in its expansive view of "provide."

Petitioners base this claim on § 272 of the Act. It requires that each BOC, even after receiving § 271(d) approval, provide most interLATA services only through a separate affiliate. See 47 U.S.C. § 272(a). Further, § 272(g)(2) places the following restriction on the BOC and its affiliate:

> A Bell operating company may not market or sell interLATA service provided by an affiliate required by this section within any of its in-region States until such company is authorized to provide interLATA services in such State under section 271(d) of this title.

*Id.* § 272(g)(2). The BOCs argue that since this section prevents them from marketing the interLATA service of an *affiliate* until they receive the go-ahead under § 271(d), it carries a clear implication that they may, before that date, market the interLATA services of a non-affiliate such as Qwest. The Commission agreed—to the extent of reading § 272(g)(2) as showing that the forbidden "provi[sion]" of § 271(a) cannot cover *all* marketing relationships. See 13 FCC Rcd at 21,463, ¶ 32. But some arrangements that are marketing in the conventional sense of the word, it thought, could also qualify as provision of service forbidden under § 271(a). See *id.* at 21,463–64, ¶ 33.

Addressing this precise question first, we think it plain that the Commission's reading of the two sections has not led it into any logical contradiction. So long as there remains some non-trivial range of marketing of non-affiliate services that does not fall under the § 271(a) ban, the Commission preserves some scope for § 272(g)(2)'s implicit authorization. The BOCs argue that the Commission in fact leaves no such room, pointing to language in the Order saying that although a BOC could offer its marketing services to a long distance supplier, it could not "represent[ ] that [the marketed] product or service is associated with its name or services." *Id.* at 21,474, ¶ 50. Thus the Commission's view would, they say, allow a marketing arrangement only if it "has no conceivable business purpose." The exact meaning of "associated with its name or services" is not before us, but we read the phrase together with the Commission's expression of concern about the BOCs' developing a "first mover's advantage" over long distance carriers in the as yet undeveloped full-service market. *Id.* at 21,467–68, 21,-473, ¶¶ 40–41, 49. Thus, although the Commission's view bars the BOCs from taking advantage of some of the synergies that their marketing of interLATA service might exploit, it cannot be said to cut the implicitly permissible marketing down to zero or its functional equivalent. For example, the Commission's decision explicitly allows a BOC to offer the services of its marketing department for sale of interLATA services, subject to the proviso noted above. The Commission cannot be said to have squeezed the life out of § 272(g)(2)'s implied permission. Thus, the BOCs' argument from § 272(g)(2) doesn't compel the narrow reading they claim for § 271(d).

Nor are there other reasons to suppose Congress clearly intended such a narrow interpretation. Unlike numerous other terms in the Telecommunications Act of 1996, neither the word "provide" nor the phrase "provide interLATA services" is anywhere defined in the Act. Cf. 47 U.S.C. § 153 (definitions). "InterLATA service" *is* defined—as "telecommunications between a point located in a local access and transport area and a point located outside such area," *id.* § 153(21)— but that doesn't help: the definition does not specify some necessary relation of an actor to such telecommunications. Nor do any of the various ordinary meanings of "provide" appear necessarily superior in this context. See 13 FCC Rcd at 21,460, ¶ 27 (comparing dictionary definitions).

▮ Petitioners also point to numerous other places where the Act uses the term "provide" or its cognates, see 47 U.S.C. § 153(44) ("provider of telecommunications services"); *id.* § 153(45) ("provide telecom-

munications services"); *id.* § 271(c) ("providing access and interconnection"); *id.* § 272(a) ("provide" various services, including interLATA services); *id.* § 275 ("provision of alarm monitoring services"), arguing that the Commission's assignment of narrow meanings to "provide" in those instances compels equal narrowness here. But although we normally attribute consistent meanings to statutory terms, "[i]dentical words may have different meanings where the subject-matter to which the words refer is not the same in the several places where they are used, or the conditions are different." *Weaver v. USIA,* 87 F.3d 1429, 1437 (D.C.Cir.1996) (internal quotation omitted). As the Commission noted, no other section besides § 271(a)-(b) uses "provide" to describe a restriction on BOCs' entry into a market where the lifting of the restriction depends on the BOCs themselves. 13 FCC Rcd at 21,462, ¶ 30. A narrow reading would thus tempt the BOCs to defer conduct that Congress hoped to accelerate—acts facilitating the development of competition in the intra-LATA market.

FCC's reading of "provide" to include the BOCs' actions here, moreover, appears clearly reasonable in the specific context of § 271. See *Chevron,* 467 U.S. at 845. As the Commission noted, § 271 both gives the BOCs an opportunity to enter the long-distance market and conditions that opportunity on the BOCs' own actions in opening up their local markets. See 13 FCC Rcd at 21,645, ¶ 36. The Commission viewed the powerful incentive set up by this scheme as shedding light on the market entry prohibition:

> [I]n order to determine whether a BOC is providing interLATA service within the meaning of section 271, we must assess whether a BOC's involvement in the long distance market enables it to obtain competitive advantages, thereby reducing its incentive to cooperate in opening its local market to competition.

*Id.* at 21,465, ¶ 37.

This seems reasonable as a general approach. Of course too-broad a notion of "competitive advantage" or "incentive" could make it nonsensical, turning it into an excuse to stifle the BOCs at every opportunity. But the FCC found that the arrangements here would have afforded the BOCs in question a serious advantage, namely a "first mover's advantage" over any non-BOC firms hoping to secure a position in the anticipated full-service market. See *id.* at 21,467–68, 21,473, ¶¶ 40–41, 49. By offering one-stop shopping for local and long distance under their own brand name and with their own customer care, see *id.* at 21,466, ¶ 38, U S WEST and Ameritech could build up goodwill as full-service providers, positioning themselves in these markets before § 271 allows them actually to enter. There appears to have been specific congressional concern over the impact of jointly marketed local and long distance service; this is manifested in the § 271(e) rule barring the major interLATA carriers from jointly marketing their interLATA service with local service obtained from a BOC, for three years or until the BOC in question gains access to the long distance market under § 271, whichever is first. See *id.* at 21,473–74, ¶ 49; 47 U.S.C. § 271(e)(1). If the BOCs could secure this advantage without opening their local service markets, the blunting of the intended incentive would be considerable—or so the Commission could reasonably find.

Petitioners seek to press the § 271(e) likeness further. They note that the Commission, despite what they claim is an incentive structure similar to § 271(a)'s, relied on the First Amendment in allowing long distance carriers covered by § 271(e) to engage in certain advertising activities paralleling what is forbidden here. See *In the Matter of Implementation of the Non–Accounting Safeguards of Sections 271 and 272 of the Communications Act of 1934, as amended,* 11 FCC Rcd 21905, 22,040–41, ¶¶ 279–80. But § 271(e) allows the long distance carriers to (1) offer and market separately their long distance service plus resold BOC services, and (2) offer and market jointly their long distance service and local service *not* based on resold

BOC services. In that context, the Commission allowed a covered carrier to proclaim its offers both of long distance and of resold BOC local service in a single ad, so long as it did not offer such service as a "bundle" or otherwise with "one-stop" shopping. *Id.* In short, it let them truthfully advertise the services they could lawfully provide, but no more. As the BOCs are *barred* from providing interLATA service until they have surmounted the § 271(d) hurdles, the present case presents no real analogy.

Context also explains the Commission's application of the "engage in the provision of alarm monitoring" language of § 275. The Commission and the petitioners spar over whether the Commission's approach here is genuinely different, but we need not resolve the clash, as the differences in the statutory contexts justify different outcomes. See 13 FCC Rcd at 21,462–63, ¶ 31. Incentives are not as crucial in a situation where the business prohibition will be lifted in a fixed time, as they will for alarm monitoring, see 47 U.S.C. § 275(a)(1), as where its duration depends on the BOC's own actions.

The Commission's action here of course does not represent a complete demarcation of the border between permitted marketing and forbidden provision. That is entirely reasonable. Apart from the Commission's general authority to choose between adjudication and rulemaking, see *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974), it makes sense for it to proceed through case-by-case judgments of a questioned action's likely effect—whether, for example, the marketing materials will cause consumers to identify the services with the BOC. While—as we've noted—some of the Commission's language on incentives is rather broad, it is not inconsistent with future judgments balancing the interests that are relevant under § 271(a). We are also puzzled by the Commission's concern that the two BOCs in each instance laid down the terms for the transaction, which Qwest humbly accepted. 13 FCC Rcd at 21,449–50, 21,452, ¶¶ 10, 14. As the BOCs had unique advantages to offer Qwest, this course of events was hardly surprising; we cannot see that the issue of who first proposed what to whom has much bearing on the policy values at stake. But the Commission's detours on the subject do not appear to have played a decisive role in its decision.

Petitioners also assert a want of substantial evidence. They regard the Commission's ultimate finding as belied by Qwest's repeated identification in the BOCs' marketing materials as the long distance provider. But that identification is still consistent with the view that the materials as a whole would lead consumers to link long-distance service to the BOCs, particularly as long distance was offered only as part of a full-service package with a BOC brand name. Nor does it appear that the FCC, by pointing to various activities characterized as "typically performed by those who resell interLATA services," 13 FCC Rcd at 21,471–73, ¶¶ 46, 48, was somehow suggesting that the ultimate finding of "provider" status depended on an intermediate finding of "reseller" status; petitioners' arguments that they are not *actually* resellers are thus misguided.

The petitions are

*Denied.*