Revised September 23, 1998

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-10140

_____

SBC COMMUNICATIONS, INC.; SOUTHWESTERN
BELL TELEPHONE COMPANY; SOUTHWESTERN
BELL COMMUNICATIONS SERVICES, INC.;
SOUTHWESTERN BELL COMMUNICATIONS
SERVICES-TEXAS, INC.; SOUTHWESTERN
BELL INTERNET SERVICES, INC.; PACIFIC
BELL; PACIFIC BELL COMMUNICATIONS;
NEVADA BELL,

                                      Plaintiffs-Appellees,

US WEST COMMUNICATIONS, INC.; BELL
ATLANTIC CORPORATION,

                                      Intervenor Plaintiffs-Appellees,

                        versus

FEDERAL COMMUNICATIONS COMMISSION;
UNITED STATES OF AMERICA,

                                      Defendants - Appellees - Appellants,

MCI TELECOMMUNICATIONS CORPORATION;
AMERICAN TELEPHONE & TELEGRAPH
CORPORATION; ASSOCIATION FOR LOCAL
TELECOMMUNICATIONS SERVICES;
COMPETITIVE TELECOMMUNICATIONS
ASSOCIATION; NATIONAL CABLE TELEVISION
ASSOCIATION; SPRINT COMMUNICATIONS
COMPANY L P; TELECOMMUNICATIONS
RESELLERS ASSOCIATION,

                        Intervenor Defendants - Appellees - Appellants,

                        versus

KEITH MAYDAK,

Movant-Appellant.

Appeals from the United States District Court for the

September 4, 1998

Before JOLLY, SMITH, and BARKSDALE, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This appeal challenges the constitutionality of a significant part of the Telecommunications Act of 1996.  The FCC, the United States, and numerous interested intervenors appeal the district court's determination that §§ 271-75 of the Act, 47 U.S.C. §§ 271-75, are an unconstitutional bill of attainder.  Finding the provisions at issue to be nonpunitive in character, we hold that they are not, in fact, a bill of attainder as that term has been defined by the Supreme Court.  Because we further hold that the provisions are also consistent with the constitutional requirements of separation of powers, equal protection, and free speech, we reverse the judgment of the district court.

I

As every antitrust law student learns these days, in 1974 the Department of Justice brought a massive, precedent-setting Sherman Act[1] suit against AT&T.  See United States v. AT&T, 461 F.Supp. 1314 (D.D.C. 1978).  For many years before the suit, most

---

[1] 15 U.S.C. § 1 et seq.

telecommunications equipment and telephone service in the United States--both local and "long distance"--had been provided by AT&T and its corporate affiliates, collectively known as the Bell System.  See United States v. AT&T, 552 F.Supp. 131, 222 (D.D.C. 1982).  Although certain isolated aspects of the Bell System had become the subject of intermittent antitrust actions, consent decrees, and federal legislative intervention dating back to 1949, see generally United States v. AT&T, 552 F.Supp. at 135-38, no broad-based attack on the system itself had ever been launched.  In 1974, however, the government changed all that.  It alleged, among other things, that the way AT&T used its various state-granted local service monopolies to also monopolize the markets in long distance service and telecommunications equipment was in contravention of § 2 of the Sherman Act.  See United States v. AT&T, 461 F.Supp. at 1317-18.  AT&T ultimately conceded this assessment, for, after some initial procedural wrangling, it eventually settled with the government in what became known as the AT&T Consent Decree or Modified Final Judgment ("MFJ").  See United States v. AT&T, 552 F.Supp. at 222-234, aff'd sub nom. Maryland v. United States, 460 U.S. 1001 (1983).  Under the MFJ, AT&T was required to divest itself of its twenty-two local exchange subsidiaries, which became known as the Bell Operating Companies or

4

"BOCs."  552 F.Supp. at 223.[2]  The BOCs were then grouped into

---

[2]As District Judge Greene explained the divestiture:

The key to the Bell System's power to impede competition has been its control of local telephone service.  The local telephone network functions as the gateway to individual telephone subscribers.  It must be used by long-distance carriers seeking to connect one caller to another.  Customers will only purchase equipment which can readily be connected to the local network through the telephone outlets in their homes and offices.  The enormous cost of the wires, cables, switches, and other transmission facilities which comprise that network has completely insulated it from competition.  Thus, access to AT&T's local network is crucial if long distance carriers and equipment manufacturers are to be viable competitors.

AT&T has allegedly used its control of this local monopoly to disadvantage these competitors in two principal ways.  First, it has attempted to prevent competing long distance carriers and competing equipment manufacturers from gaining access to the local network, or to delay that access, thus placing them in an inferior position vis-a-vis AT&T's own services.  Second, it has supposedly used profits earned from the monopoly local telephone operations to subsidize its long distance and equipment businesses in which it was competing with others.

For a great many years, the Federal Communications Commission has struggled, largely without success, to stop practices of this type through the regulatory tools at its command.  A lawsuit the Department of Justice brought in 1949 to curb similar practices ended in an ineffectual consent decree.  Some other remedy is plainly required; hence the divestiture of the local Operating Companies from the Bell System.  This divestiture will sever the relationship between this local monopoly and the other, competitive segments of AT&T, and it will thus ensure--certainly better than could any other type of relief--that the practices which allegedly have lain heavy on the telecommunications industry will not recur.

552 F.Supp. at 223.

seven "regional Operating Companies" or "RBOCs." 552 F.Supp. at 142 n.41. In addition, because the BOCs were allowed to retain their state-regulated local service monopolies under the terms of the MFJ, they became subject to various restrictions on their own lines of business. In particular, the BOCs were barred from competing in the markets for long distance,[3] telecommunications equipment, and information services (including electronic publishing and alarm monitoring). 552 F.Supp. at 224.[4] The

---

[3]By "long distance," we refer to what is technically known as "interLATA" service. In implementing the MFJ, the district court established numerous local access and transport areas or "LATAs" within which the BOCs were permitted to operate and provide telephone service. See United States v. West. Elec. Co., 569 F.Supp. 990, 993-94 (D.D.C. 1983). The way the long distance line-of-business restriction played out, each BOC was allowed to transmit telecommunications information only between points within a single LATA, providing what is, basically, the traditional local telephone service, even though every BOC encompassed several LATA's as a geographical matter. When a person in one LATA called a person in another, the BOC serving the caller's LATA was required to transmit the call to an interexchange carrier, such as AT&T or MCI, which then carried the call on its own network across the LATA boundaries, whereupon it was picked up by the BOC (possibly the same one) that served the called party's LATA. See United States v. West. Elec. Co., 969 F.2d 1231, 1233 (D.C. Cir. 1992). This is "long distance" service. Local, or "intraLATA" service, on the other hand, is the making of calls entirely within a single LATA, even though such calls are sometimes subject to per-minute tolls.

[4]Again, as Judge Greene explained:

    After the divestiture, the Operating Companies will possess a monopoly over local telephone service. According to the Department of Justice, the Operating Companies must be barred from entering all competitive markets to ensure that they will not misuse their monopoly power. The Court will not impose restrictions

6

restriction on information services was subsequently lifted, <u>see</u> <u>United States v. West. Elec. Co.</u>, 767 F.Supp. 308 (D.D.C. 1991), <u>aff'd</u>, 993 F.2d 1572 (D.C. Cir. 1993), but the BOCs then became subject to detailed FCC regulations governing the provision of information and other "enhanced" services. <u>See generally</u> <u>In re Computer III Further Remand Provisions: Bell Operating Company Provision of Enhanced Services</u>, 10 F.C.C.R. 8360 (1995).

As the very existence of the numerous and ponderous post-1982 decisions of the D.C. courts should make clear, however, the MFJ was far from a final resolution of the nation's telecommunications dilemma. Its enforcement and alteration in the light of technological progress and changing market circumstances ultimately required substantial monitoring on the part of the district court, and the extensive judicial tinkering that resulted prompted many

_____

> simply for the sake of theoretical consistency. Restrictions must be based on an assessment of the realistic circumstances of the relevant markets, including the Operating Companies' ability to engage in anticompetitive behavior, their potential contribution to the market as an added competitor for AT&T, as well as upon the effects of the restrictions on the rates for local telephone service. This standard requires that the Operating Companies be prohibited from providing long distance services and information services, and from manufacturing equipment used in the telecommunications industry. Participation in these fields carries with it a substantial risk that the Operating Companies will use the same anticompetitive techniques used by AT&T in order to thwart the growth of their own competitors.

552 F.Supp. at 224.

pundits to dub District Judge Greene the country's "telecommunication's czar."[5] Unsurprisingly, Congress soon became skeptical of this unusual title of judicial nobility,[6] and ultimately spent many long and contentious years in drafting a system of comprehensive telecommunications regulation to replace and supplement the MFJ.  See SBC Communications, Inc. v. FCC, 138 F.3d

---

[5]See Fred H. Cate, The National Information Infrastructure: Policymaking and Policymakers, 6 Stan. L. & Pol'y Rev. 43, 50 (1994) (noting that, although "Judge Greene rendered his decision approving the Modified Final Judgment in 1982," he "retained jurisdiction under the consent decree to control the operations of both AT&T and the [RBOCs]" and "the breadth of that decree and the substantial discretion given judges to interpret antitrust laws, 'probably makes him the single most powerful decisionmaker in U.S. communications policy today,'" a veritable "'telecom czar'") (quoting Mark S. Nadel, U.S. Communications Policymaking: Who & Where, 13 Hastings Comm. & Ent. L. J. 273, 289 (1991) and Telcom Showdown: Battle Lines Harden as Baby Bells Fight to Kill Restrictions, Wall St. J., July 22, 1994, at A1, respectively); see also Michael Schrage, Is There a Shade of Greene In the Microsoft Decision?, Wash. Post, Feb. 17, 1995, at B3 ("Judge Greene has been alternately praised and excoriated as a 'telecommunications czar' whose impact on telecommunications is still more forceful than that of AT&T Chairman Robert Allen or Tele-Communications Inc. boss John Malone."); Editorial, Review & Outlook: State of the Presidency, Wall St. J., Feb. 2, 1990, at A14 ("Judge Greene made himself Telecommunications Czar as part of the AT&T breakup; maybe he'd now like to take over running Lebanon."); Paula Dwyer, The Baby Bells: Ready, Get Set, Diversify, 2962 Bus. Wk. 29 (1986) (noting that a 1986 D.C. Circuit ruling was "the latest blow to Judge Greene, who, as czar of the breakup of AT&T, is the 'dominant influence on the industry,' according to William L. Weiss, chairman and chief executive of Ameritech," and remarking, presciently, that "Greene's clout and influence are already under attack on Capitol Hill, where lawmakers are pushing legislation to return supervision of the Baby Bells to the FCC").

[6]Cf. U.S. Const., Art. I, sec 9, cl.8.

410, 412-13 (D.C. Cir. 1998).  On February 8, 1996, President Clinton executed these legislative labors into law as the Telecommunications Act of 1996 (the "Act").

As has been widely recognized, the core function of the Act is to "'provide for a pro-competitive, deregulatory national policy framework . . . by opening all telecommunications markets to competition.'"  SBC Communications, 138 F.3d at 413 (quoting H.R. Conf. Rep. No. 104-458, at 1 (1996), reprinted in 1996 U.S.C.C.A.N. at 124).  To effectuate this goal, the Act prohibits states and localities from sanctioning local service monopolies or "'prohibiting the ability of any entity to provide . . . intrastate telecommunications service.'"  Id. (quoting 47 U.S.C. § 253(a)). It also places numerous and onerous duties and restrictions on all local telephone service providers ("Local Exchange Carriers," or "LECs")[7] that are designed to prevent a recurrence of the uncompetitive use of local service market power that occurred under the Bell System.  See id.; 47 U.S.C. §§ 251-52.

In addition to these generally applicable local competition provisions, however, the Act also contains a number of provisions directed specifically at the BOCs.  First, the uncodified § 601(a)(1) provides that the restrictions imposed by the MFJ are

---

[7]Of which there are now many hundreds of independent examples (e.g., GTE Corp., Sprint Communications Company, Southern New England Telephone Company, etc.) in addition to the BOCs.

9

lifted and replaced by the restrictions of the Act.  See Pub. L. No. 104-104, § 601(a)(1), 110 Stat. 143 (1996); cf. United States v. West. Elec. Co., 1996 WL 255904 (D.D.C. Apr. 11, 1996) (terminating the MFJ in accordance with § 601(a)(1)).  Second, §§ 271-76, entitled "Special Provisions Concerning Bell Operating Companies," impose renewed line-of-business restrictions on the activities of the twenty remaining BOCs; § 153(4) of the Act makes quite clear that the additional restrictions are only applicable to these twenty specific, named corporations.  See 47 U.S.C. §§ 153(4) & 271-76. It is these latter "Special Provisions" that are at the heart of this case, and they must accordingly be examined in some detail.[8]

Inconvenient to that purpose, the Special Provisions are drafted in that rather soulless bureaucratese that is an all too familiar sight on the American legal landscape.  We have attempted to pierce the statutory fog, however, and would summarize the Special Provisions' effect essentially as follows.

First, under § 271, each BOC must obtain prior authorization from the FCC before providing non-incidental long distance service to customers within the states in which the BOC was allowed to provide local service prior to the enactment of the Act ("in-region long distance service").  47 U.S.C. § 271(a) & (b).  The FCC is to

---

[8]With the exception of § 276, relating to payphone service, which has not been challenged.

grant authorization only after a number of complex criteria evidencing free competition in the particular local service market have been established. 47 U.S.C. § 271(d)(3); see generally SBC Communications, 138 F.3d at 413-14. Even then, however, the BOC in question may initially only provide long distance service through a separate affiliate. 47 U.S.C. §§ 271(d)(3)(B) & 272(f)(1). The BOCs are permitted to provide incidental long distance service and long distance service to customers located outside of their regions of former monopoly ("out-of-region long distance service") without significant limitation or prior authorization. 47 U.S.C. § 271(b)(2) & (3).

Second, under § 273, the BOCs may not manufacture or provide telecommunications equipment until they have met the requirements for non-incidental, in-region long distance service in § 271(d), and, once again, even then only through a separate affiliate for an interim period. 47 U.S.C. §§ 272(f)(1) & 273(a).

Finally, under §§ 274 & 275, the BOCs may not provide electronic publishing or alarm monitoring services until February 8, 2001, unless they do so by way of a separate affiliate or joint venture and, in the case of alarm monitoring, only if they were engaged in the business prior to November 30, 1995. 47 U.S.C. §§ 274(a), 274(g)(2), & 275(a).

Essentially, the Special Provisions recreate most of the original line-of-business prohibitions of the MFJ, with some tweaking. In the case of information services, the recreation represents a reimposition of restrictions that had already been lifted under the regime of the MFJ. In the case of in-region long distance service and telecommunications equipment, however, the Act simply changes the administrator and specifies the rules by which Judge Greene's long-running restrictions can be lifted.

II

On April 11, 1997, plaintiff SBC Communications, which is of course one of the RBOCs,[9] applied to the FCC pursuant to § 271 to have the long distance line-of-business restriction lifted for its local service area of Oklahoma. The FCC determined that the statutory criteria had not been met, and therefore denied the application on June 26, 1997. SBC appealed that ruling to the D.C. Circuit, where it was affirmed on March 20, 1998. See SBC Communications, 138 F.3d at 410.

Without waiting for the outcome of that appeal, however, on July 2, 1997, SBC and its subsidiaries filed suit against the United

_____

[9]SBC is currently parent to BOCs Southwestern Bell, Pacific Bell, and Nevada Bell, and will become parent to Illinois Bell, Indiana Bell, Wisconsin Bell, Michigan Bell, and Ohio Bell upon completion of its planned merger with Ameritech, another RBOC. Southwestern Bell provides local service to customers in Texas, Missouri, Oklahoma, Arkansas, and Kansas. Pacific Bell serves California.

States and the FCC in the Federal District Court for the Northern District of Texas, alleging that all of the Special Provisions were facially unconstitutional under the Bill of Attainder and Equal Protection Clauses, and that § 274 violated the Free Speech Clause as well. Several long distance companies, including MCI Telecommunications Corp., Sprint Communications Company, and AT&T, the BOCs' erstwhile parent, intervened on the government's side in the dispute, and two other RBOCs, US West Communications and Bell Atlantic Corp., intervened on SBC's. Bell Atlantic added a slightly more nuanced separation of powers challenge to SBC's other constitutional complaints.

On December 31, 1997, ruling on cross-motions for summary judgment, District Judge Kendall held that the Special Provisions constituted an unconstitutional bill of attainder and that they were severable from the rest of the Act. He therefore granted SBC's motion and declared the challenged sections void. From this final judgment the United States, the FCC, and the defendant-intervenors timely appeal.

### III

This court reviews the constitutionality of a federal statute de novo. <u>United States v. Bailey</u>, 115 F.3d 1222, 1225 (5th Cir. 1997).

13

IV

On appeal, SBC and the other appellees urge all of the
arguments offered below as potential bases for affirming some or all
of the decision of the district court.  We consider each contention
in turn, beginning with SBC's primary and most substantial complaint
that the Special Provisions constitute a bill of attainder.

A

Article I, sec. 9, cl. 3 of the United States Constitution
provides that "[n]o Bill of Attainder or ex post facto law shall be
passed [by Congress]."[10]  As the Supreme Court has often clarified,
"[i]n forbidding bills of attainder, the draftsmen of the
Constitution sought to prohibit the ancient practice of the
Parliament in England of punishing without trial 'specifically
designated persons or groups.'"  Selective Service System v.
Minnesota Public Interest Research Group, 468 U.S. 841, 847 (1984)
(quoting United States v. Brown, 381 U.S. 437, 447 (1965)).
Consistent with this characterization, the Court has generally
defined a bill of attainder as "'a law that legislatively determines
guilt and inflicts punishment upon an identified individual without
provision of the protections of a judicial trial.'"  Id. (quoting
Nixon v. Administrator of General Services, 433 U.S. 425, 468

---

[10]Art. I, sec. 10, cl. 1 contains a parallel provision
applicable to the states.

14

(1977)).  Where, as here, the liability in question clearly attaches

by operation of the legislative act alone, the constitutional test

may be summarized in the following two-pronged test: First, has the

legislature acted with specificity?  Second, has it imposed

punishment?

In this case, SBC argues that the Special Provisions constitute

a bill of attainder because they impose line-of-business

restrictions on named corporations.  As SBC portrays the Special

Provisions, they represent Congress's unconstitutional legislative

determination that the BOCs are the guilty spawn of AT&T, who

deserve to be deprived of their current ability to enter the long

distance, information services, and telecommunications equipment

markets as punishment for the immutable past antitrust violations

of their former parent.  The district court essentially agreed with

this analysis.

Notwithstanding beguiling arguments that support the district

court's holding, at bottom, we simply cannot find a constitutional

violation in this case.  Even assuming that the Bill of Attainder

Clause applies to corporations,[11] and even assuming that the Special

---

[11]Which does seem likely.  Although the Court has yet to reach the question directly, it has suggested as much in dictum.  See Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 239 n.9 (1995) (indicating that the Clause applies to laws that punish "a single individual or *firm*") (emphasis added).  Furthermore, it has been established that a number of very similar constitutional rights do apply in the corporate setting.  See, e.g., Virginia Pharmacy Bd.

Provisions are sufficient to meet the specificity prong of the test,[12] there simply cannot be a bill of attainder unless it is also

_v. Virginia Citizens Consumer Council, Inc._, 425 U.S. 748 (1976) (freedom of speech); _United States v. Martin Linen Supply Co._, 430 U.S. 564 (1977) (double jeopardy); _Penn Central Transportation Co. v. New York City_, 438 U.S. 104 (1978) (takings); _Marshall v. Barlow's, Inc._, 436 U.S. 307 (1978) (searches and seizures); _Helicopteros Nacionales de Colombia v. Hall_, 466 U.S. 408 (1984) (due process); _Metropolitan Life Ins. Co. v. Ward_, 470 U.S. 869 (1985) (equal protection).

[12]Again, probably a safe assumption in this case, as the Special Provisions identify the burdened parties by name. In the entirety of the Supreme Court's attainder jurisprudence, the only case to suggest that a statute naming individuals might not satisfy the specificity prong of the test was the very unusual _Nixon_. There, the Court indicated that a law requiring Richard M. Nixon by name to turn over his presidential papers to the Administrator of General Services might not be specific enough to constitute a bill of attainder, because, as the only former president whose papers were not protected in a presidential library, Nixon represented a "legitimate class of one" for purposes of such legislation. _Id._, 433 U.S. at 472. That unusual case seems inapposite to the one at hand, particularly in the light of the fact that the rest of the Court's attainder jurisprudence, both subsequent and prior, has consistently applied a broad interpretation of specificity. _See, e.g._, _Selected Service_, 468 U.S. at 847 (noting that "'[t]he singling out of an individual for legislatively imposed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons'") (quoting _Communist Party v. Subversive Activities Control Board_, 367 U.S. 1, 86 (1961)); _United States v. Brown_, 381 U.S. 437 (1965) (finding law applicable to past members of the Communist Party specific enough to constitute an attainder); _Cummings v. Missouri_, 71 U.S. (4 Wall.) 277 (1866) (noting that, although "bills [of attainder] are generally directed against individuals by name," they "may also be directed against a whole class," as "[t]he bill against the Earl of Kildare and others, passed in the reign of Henry VIII," which "enacted that 'all such persons which be or heretofore have been comforters, abettors, partakers, confederates, or adherents unto the said' late earl, and certain other parties, who were named, 'in his or their false and traitorous acts and purposes, shall in

16

the case that the Special Provisions impose punishment on the BOCs.

As Justice Scalia recently reiterated in <u>Plaut v. Spendthrift Farm, Inc.</u>, 514 U.S. 211 (1995):

> The premise that there is something wrong with particularized legislation is of course questionable. While legislatures usually act through laws of general applicability, that is by no means their only legitimate mode of action. Private bills in Congress are still common, and were even more so in the days before establishment of the Claims Court. Even laws that impose a duty or liability upon a single individual or firm are not on that account invalid--or else we would not have the extensive jurisprudence that we do concerning the Bill of Attainder Clause, including cases which say that it requires not merely "singling out" but also punishment, and a case which says that Congress may legislate "a legitimate class of one."

<u>Id.</u> at 239 n.9 (citing <u>United States v. Lovett</u>, 328 U.S. 303, 315-18 (1946), and <u>Nixon</u>, 433 U.S. at 472, for the two final propositions); <u>see also</u> <u>Selective Service</u>, 468 U.S. at 851 (stating expressly that "[e]ven if the specificity element were deemed satisfied," the provision at issue "would not necessarily implicate the Bill of Attainder Clause," because "[t]he proscription against bills of attainder reaches only statutes that inflict punishment on the specified individual or group").[13]   Because punishment is a

---

likewise stand, and be attainted, adjudged, and convicted of high treason'") (quoting 28 Hen. VIII, c. 3 (1536)).

[13]<u>See also</u> <u>BellSouth Corp. v. FCC</u>, 144 F.3d 58, 63-64 (D.C. Cir. 1998) (finding punishment a necessary condition of a bill of attainder, regardless of specificity, in rejecting an attack on § 274 of the Special Provisions at issue in this case); <u>Dehainaut v. Peña</u>, 32 F.3d 1066, 1071 (7th Cir. 1994) (same with regard to a

17

necessary element of an unconstitutional bill of attainder, and because we can find in the Special Provisions no punishment--as that term must be defined in the context of this case--our resolution of that question is dispositive of the attainder claim.

1

As an initial matter, however, we must acknowledge that just what constitutes "punishment" for purposes of the Bill of Attainder Clause is a question of some historical and doctrinal complexity. In particular, the distinction between the punitive and the prophylactically regulatory, which is of course at the root of this case, is admittedly a fine one.

Under the common law, there were no such nuances: the very concept of "attainder" was clearly limited to criminal cases of a capital nature. As Blackstone described it:

> When sentence of death, the most terrible and highest judgment in the laws of England, is pronounced, the immediate inseparable consequence by the common law is *attainder*. For when it is now clear beyond all dispute, that the criminal is no longer fit to live upon the earth, but is to be exterminated as a monster and a bane to human society, the law sets a note of infamy upon him, puts him out of it's [sic] protection, and takes no

_____

provision imposing a perpetual employment bar on the air traffic controllers fired by President Reagan); <u>Fresno Rifle and Pistol Club, Inc. v. Van de Kamp</u>, 965 F.2d 723, 727 (9th Cir. 1992) (same with regard to a law affecting certain named firearms (and thus their manufacturers)); <u>but see</u> <u>BellSouth</u>, 144 F.3d at 72 (Sentelle, J., dissenting) (noting that, although "mere specificity may not make an act a bill of attainder," in "most cases the Court has required little more").

farther care of him than barely to see him executed. He is then called attaint, *attinctus*, stained, or blackened. He is no longer of any credit or reputation; he cannot be a witness in any court; neither is he capable of performing the functions of another man: for, by an anticipation of his punishment, he is already dead in law. . . . The consequences of attainder are forfeiture, and corruption of blood.

4 William Blackstone, Commentaries *373-74 (citing 3 Inst. 213).[14]

Tough stuff. Nevertheless, and consistent with this definition, common law bills of attainder were "such special acts of the legislature, as inflict[ed] capital punishments upon persons supposed to be guilty of high offences, such as treason and felony, without any conviction in the ordinary course of judicial proceedings."[15] 3 Joseph Story, Commentaries on the Constitution of

---

[14]As Blackstone further clarified:

[W]hen judgment is once pronounced, both law and fact conspire to prove [the attainted person] completely guilty; and there is not the remotest possibility left of any thing to be said in his favour. Upon judgment therefore of death, and not before, the attainder of a criminal commences: or upon such circumstances as are equivalent to judgment of death; as judgment of outlawry on a capital crime, pronounced for absconding or fleeing from justice, which tacitly confesses the guilt. And therefore either upon judgment of outlawry, or of death, for treason or felony, a man shall be said to be attainted.

Id.

[15]For example, the 1685 attainder of James, Duke of Monmouth:

WHEREAS James duke of Monmouth has in an hostile manner invaded this kingdom and is now in open rebellion, levying war against the king, contrary to the duty of

the United States § 1338 at 209 (Boston 1833). A similar act that inflicted "a milder degree of punishment than death" was termed a "bill of pains and penalties." Id. at 209-10.

Although some of the Supreme Court's earliest opinions appeared to recognize that attainder was technically confined to capital cases,[16] its subsequent jurisprudence has uniformly supported a broader sweep for the constitutional prohibition. See, e.g., Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 138 (1810) (Marshall, J.) ("A bill of attainder may affect the life of an individual, or may confiscate his property, or may do both."); Cummings, 71 U.S. at 323 ("Within the meaning of the Constitution, bills of attainder include

---

> allegiance; Be by and with the advice and consent of the lords spiritual and temporal, and commons in this parliament assembled, and by the authority of same, That the said James duke of Monmouth stand and be convicted and attainted of high treason, and that he suffer pains of death, and incur all forfeitures as a traitor convicted and attainted of high treason.

1 Jac. II, c. 2 (1685), quoted in Nixon, 433 U.S. at 473 n.35.

[16]See, e.g., Calder v. Bull, 3 U.S. (3 Dall.) 386, 389 (1798) (noting that "the Parliament of Great Britain claimed and exercised a power to pass [ex post facto] laws, under the denomination of bills of attainder, or bills of pains and penalties; the first inflicting capital, and the other less, punishment"); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 179 (1803) (Marshall, J.) ("The constitution declares that 'no bill of attainder or ex post facto law shall be passed.' If, however, such a bill should be passed and a person should be prosecuted under it, must the court condemn to death those victims whom the constitution endeavours to preserve?").

20

bills of pains and penalties."); <u>Lovett</u>, 328 U.S. at 314 ("'A bill
of attainder is a legislative act which inflicts punishment without
a judicial trial.'") (quoting <u>Cummings</u>, 71 U.S. at 323); <u>Brown</u>, 381
U.S. at 447 (noting that "the Bill of Attainder Clause [i]s not to
be given a narrow historical reading (which would exclude bills of
pains and penalties), but [i]s instead to be read in light of the
evil the Framers . . . sought to bar: legislative punishment, of any
form or severity, of specifically designated persons or groups");
<u>cf.</u> 3 Story, <u>Commentaries</u> § 1338 at 210 ("But in the sense of the
constitution, it seems, that bills of attainder include bills of
pains and penalties.") (citing <u>Fletcher</u>).[17]  Apart from making clear

---

[17]Although our information is somewhat limited, <u>see</u> Note,
<u>Beyond Process: A Substantive Rationale for the Bill of Attainder
Clause</u>, 70 Va. L. Rev. 475, 477 (1984) (stating that "[t]here is no
record of any debate about including a ban on the bills in the
Constitution," and that the provision "is scarcely mentioned by
contemporary commentators"), this broad construction of the
Clause's reach would appear to be consistent with the contemporary
views of the Framers.  In addressing Congress shortly after the
Whiskey Rebellion of 1794, President Washington opined that
"certain self-created societies" had been responsible for
encouraging the insurrection.  4 Annals of Cong. 788 (1794).  As it
turned out, certain members of Congress were none too fond of these
"Democratic Societies" or "Jacobin Clubs" either, and when the
House considered its ceremonial reply to the President's speech,
Rep. Fitzsimons of Pennsylvania moved to insert a paragraph
expressing "reprobation" of the societies.  4 Annals of Cong. 899.
As Professor Currie has described it, "the friends of France
exploded in wrath" at the suggestion.  <u>See generally</u> David P.
Currie, <u>The Constitution in Congress: The Federalist Period 1789-
1801</u> 190-91 (Chicago 1997).  More to the present point, however,
James Madison was of the specific opinion that including the
paragraph would constitute a bill of attainder, because
"denunciation" was punishment for purposes of that provision of the

21

that the Clause reaches punishment of a lesser severity than the death penalty, however, these general statements provide little assistance to our present inquiry.

More guidance is found by considering the details of the Court's development of the punishment prong. In <u>Cummings v. Missouri</u>, 71 U.S. (4 Wall.) 277 (1866), and its companion case, <u>Ex Parte Garland</u>, 71 U.S. (4 Wall.) 333 (1866), Justice Field considered whether laws requiring that persons swear an oath under penalty of perjury disclaiming any past sympathy for the Confederacy before engaging in certain professions[18] constituted punishment for attainder purposes. Noting that "[t]he deprivation of any rights, civil or political, previously enjoyed, may be punishment, the circumstances attending and the causes of the deprivation determining this fact," 71 U.S. at 320, and that "[d]isqualification from the pursuits of a lawful avocation . . . may also[ be], and often has been, imposed as punishment" under the English law, <u>id.</u> (citing 4 Blackstone, <u>Commentaries</u> at *44), he held that the oath requirements acted to exclude the burdened individuals from lawful employment on the basis of past conduct, and were therefore

_____

Constitution. 4 Annals of Cong. 934.

[18]Ministry under a provision of Missouri's post-war constitution in <u>Cummings</u>, and the practice of law in federal court under a congressional enactment in <u>Garland</u>.

22

punishment for attainder purposes.  See Cummings, 71 U.S. at 325;

Garland, 71 U.S. at 380.

Although Cummings and Garland might be viewed as establishing

that any exclusion from a profession on the basis of past conduct

is punishment for attainder purposes,[19] a closer examination reveals

a more subtle analysis.  In both cases, a four-vote dissent written

by Justice Miller was premised on the belief that the laws in

question were enacted not to punish the burdened individuals but

instead as a prophylactic measure to protect the public from their

probable future bad acts.  See Garland, 71 U.S. at 393-96 (Miller,

J., joined by Chase, CJ., and Swayne & Davis, JJ., dissenting)

(arguing that, in the light of recent historic events, the oath

requirement was merely a legitimate "qualification, exacted in self-

defence, of all who took part in administering the government . . .

and . . . was not passed for the purpose of inflicting punishment,

however merited, for past offences").  Although obviously taking a

different view of the ultimate outcome, Justice Field appeared to

---

[19]See, e.g., Cummings, 71 U.S. at 321-22:

> The theory upon which our political institutions rest is,
> that all men have certain inalienable rights--that among
> these are life, liberty and the pursuit of happiness; and
> that in the pursuit of happiness all avocations, all
> honors, all positions, are alike open to every one, and
> that in the protection of these rights all are equal
> before the law.  Any deprivation or suspension of any of
> these rights for past conduct is punishment, and can be
> in no otherwise defined.

agree with Justice Miller's core proposition that a properly crafted prophylactic measure could survive attainder analysis, even where the finding of a propensity for future conduct was based solely on past acts, and the result was a bar from future employment. See Cummings, 71 U.S. at 319-20 (noting that "[i]t is evident from the nature of the pursuits and professions of the parties . . . that many of the acts, from the taint of which they must purge themselves, have no possible relation to their fitness for those pursuits and professions" and that the oath requirement, therefore, "was exacted, not from any notion that the several acts designated indicated unfitness for the callings, but because it was thought that the several acts deserved punishment"); Garland, 71 U.S. at 379 ("The legislature may undoubtedly prescribe qualifications for the office, to which [the burdened individual] must conform, as it may, where it has exclusive jurisdiction, prescribe qualifications for the pursuit of any of the ordinary avocations of life. The question, in the case, is not as to the power of Congress to prescribe qualifications, but whether that power has been exercised as a means for the infliction of punishment, against the prohibition of the Constitution.").

This relevance of applicational context and the proper existence of a "prophylactic" exception to the Bill of Attainder

24

Clause[20] was developed further in <u>Dent v. West Virginia</u>, 129 U.S. 114 (1889), and <u>Hawker v. New York</u>, 170 U.S. 189 (1898). First, in <u>Dent</u>, Justice Field made a major interpretation of his own majority opinions in <u>Cummings</u> and <u>Garland</u> in the context of a bill of attainder challenge to a state law requiring certain educational qualifications in order to practice medicine. He held:

> The cases of <u>Cummings v. State of Missouri</u>, 4 Wall. 277, and of <u>Ex parte Garland</u>, <u>id.</u> 333, upon which much reliance is placed, do not, in our judgment, support the contention of the plaintiff in error. . . . They only determine that one who is in the enjoyment of a right to preach and teach the Christian religion as a priest of a regular church, and one who has been admitted to practice the profession of the law, cannot be deprived of the right to continue in the exercise of their respective professions by the exaction from them of an oath as to their past conduct, *respecting matters which have no connection with such professions*. Between this doctrine and that for which the plaintiff in error contends there is no analogy or resemblance. The constitution of Missouri and the act of Congress in question in those cases were designed to deprive parties of their right to continue in their professions for past acts, or past expressions of desires and sympathies, *many of which had no bearing upon their fitness to continue in their professions*. The law of West Virginia was intended to secure such skill and learning in the profession of medicine that the community might trust with confidence those receiving a license under authority of the state.

129 U.S. at 125-28 (emphasis added). In <u>Hawker</u>, the Court took the <u>Dent</u> analysis one step farther and upheld a state ban on medical

---

[20]The dissent erroneously credits us instead of Justices Miller and Field with the "discovery" of this exception. We have only supplied its moniker.

25

practice by convicted felons as also not constituting punishment for purposes of the Bill of Attainder or Ex Post Facto Clauses.  Relying expressly on the above quoted language in <u>Dent</u>, the Court held that the law was not unconstitutional because it did not "seek[] to further punish a criminal, but only to protect . . . citizens from physicians of bad character."  <u>Id.</u> at 196.

Further development of the prophylactic exception emerged under Justice Frankfurter's tutelage.  In <u>United States v. Lovett</u>, 328 U.S. 303 (1946), the Court examined a federal law that cut off salary payments to certain named federal employees, allegedly due to their "subversive" activities.  Finding that the law "'operate[d] as a legislative decree of perpetual exclusion' from a chosen vocation," and thus "accomplishe[d] punishment of named individuals without judicial trial," Justice Black struck it down as an unconstitutional bill of attainder.  328 U.S. at 316 (quoting <u>Cummings</u> and <u>Garland</u>).  Justice Frankfurter took a slightly different view, however.  Taking his cue from <u>Hawker</u> and the historical foundations of the Clause in the English law, he reiterated that "punishment is a prerequisite" for a bill of attainder, and that:

> Punishment presupposes an offense, not necessarily an act previously declared criminal, but an act for which retribution is exacted.  The fact that harm is inflicted by governmental authority does not make it punishment.  Figuratively speaking all discomfiting action may be deemed punishment because it deprives of what otherwise

26

would be enjoyed.  But there may be reasons other than punitive for such deprivation.  A man may be forbidden to practice medicine because he has been convicted of a felony, or because he is no longer qualified.  "The deprivation of any rights, civil or political, previously enjoyed, may be punishment, *the circumstances attending and the causes of deprivation determining this fact*."

328 U.S. at 324 (Frankfurter, J., joined by Reed, J., concurring [in the judgment]) (citing <u>Hawker</u> and <u>Dent</u>, and quoting <u>Cummings</u>, 71 U.S. at 320, respectively) (emphasis added).  Because he found no indication in the text of the statute or the circumstances of its passage that Congress intended it as a punitive measure, Justice Frankfurter concluded that it was not a bill of attainder.  <u>Id.</u> at 324-27.[21]

Following <u>Lovett</u>, Justice Frankfurter's views on the Bill of Attainder Clause commanded a majority for a number of cases in which the Court rejected every attainder challenge that it considered.  See <u>American Communications Ass'n v. Douds</u>, 339 U.S. 382, 413-14 (1950) (Vinson, CJ.) (rejecting attainder challenge to federal law conditioning recognition of a labor organization on the filing of affidavits by its officers that they did not belong to the Communist Party and did not believe in overthrow of the government by force);

---

[21]The dissent dismisses our reference to Justice Frankfurter's concurrence in <u>Lovett</u> because it did not reflect the majority view in that case.  Such a back-of-the-hand to the alleged "cornerstone of the majority's theory" (<u>see</u> Dissent, p. __) ignores the influence of the Frankfurtian view in many subsequent cases cited herein.

<u>Garner v. Board of Pub. Works</u>, 341 U.S. 716, 722-23 (1951) (Clark, J.) (same as to municipal ordinance requiring employees to take oath that they had not advocated, or belonged to organization advocating, overthrow of government by force and violence in the preceding five years); <u>DeVeau v. Braisted</u>, 363 U.S. 144, 160 (1960) (Frankfurter, J.) (same as to state law prohibiting felons from soliciting or receiving dues on behalf of any waterfront union); <u>Flemming v. Nestor</u>, 363 U.S. 603, 617 (1960) (Harlan, J.) (same as to federal law providing for the termination of Social Security benefits of aliens who were deported on certain grounds); <u>Communist Party v. Subversive Activities Control Board</u>, 367 U.S. 1, 86-88 (1961) (Frankfurter, J.) (same as to federal law imposing registration and other burdens on "Communist-action" organizations). Although some of these decisions were premised in part on a strict historical reading[22] of the Clause[23] as requiring that a bill specify the

---

[22]Since expressly abandoned. <u>See</u> <u>Brown</u>, 381 U.S. at 447.

[23]Based on Justice Frankfurter's general model of bifurcated constitutional adjudication:

> Broadly speaking two types of constitutional claims come before this Court. Most constitutional issues derive from the broad standards of fairness written into the Constitution (e.g. "due process," "equal protection of the laws," "just compensation"), and the division of power as between States and Nation. Such questions, by their very nature, allow a relatively wide play for individual legal judgment. The other class gives no such scope. For this second class of constitutional issues derives from very specific provisions of the

offense and clearly declare the guilt of the burdened individual or class to be unconstitutional,[24] they also maintained the prophylactic exception developed in Hawker and Dent. See, e.g., Douds, 339 U.S. at 413-14 (finding Lovett, Garland, and Cummings distinguishable because "in the previous decisions the individuals involved were in fact being punished for past actions; whereas in this case they are subject to possible loss of position only because there is substantial ground for the congressional judgment that their beliefs and loyalties will be transformed into future conduct," and noting that, even though "the history of the [burdened

---

          Constitution.  These had their source in definite grievances and led the Fathers to proscribe against recurrence of their experience.  These specific grievances and the safeguards against their recurrence were not defined by the Constitution.  They were defined by history.  Their meaning was so settled by history that definition was superfluous. Judicial enforcement of the Constitution must respect these historic limits.  The prohibition of bills of attainder falls of course among these very specific constitutional provisions.

Lovett, 328 U.S. at 321 (Frankfurter, J., joined by Reed, J., concurring [in the judgment]).

[24]See Lovett, 328 U.S. at 321-23 (Frankfurter, J., joined by Reed, J., concurring [in the judgment]) ("The distinguishing characteristic of a bill of attainder is the substitution of legislative determination of guilt and legislative imposition of punishment for judicial finding and sentence. . . . All bills of attainder specify the offense for which the attainted person was deemed guilty and for which the punishment was imposed. There was always a declaration of guilt either of the individual or the class to which he belonged. The offense might be a pre-existing crime or an act made punishable ex post facto.").

individuals'] past conduct was the foundation for the judgment as to what the future conduct is likely to be," that fact "does not alter the conclusion that [the statute] is intended to prevent future action rather than to punish past action"); <u>DeVeau</u>, 363 U.S. at 160 (finding that the state "sought not to punish ex-felons, but to devise what was felt to be a much-needed scheme of regulation of the waterfront, and for the effectuation of that scheme it became important whether individuals had previously been convicted of a felony"); <u>Flemming</u>, 363 U.S. at 617 (noting, with respect to the statute before the Court, that "it cannot be said, as was said of the statute in <u>Cummings</u>, that [the disability imposed] bears no rational connection to the purposes of the legislation of which it is a part, and must without more therefore be taken as evidencing a Congressional desire to punish") (citing <u>Cummings</u>, 71 U.S. at 319, and <u>Dent</u>, 129 U.S. at 126).

After this Frankfurtian phase, however, the Court appeared to pointedly reassess the essential nature of the Clause, and the scope of the punishment requirement. In <u>United States v. Brown</u>, 381 U.S. 437 (1965), after surveying the above described cases, Chief Justice Warren viewed the Bill of Attainder Clause as expressive of some of the most fundamental ideals of separation of powers, in addition to its more specific prohibition:

> [T]he Bill of Attainder Clause not only was intended as
> one implementation of the general principle of

30

fractionalized power, but also reflected the Framers' belief that the Legislative Branch is not so well suited as politically independent judges and juries to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons. "Every one must concede that a legislative body, from its numbers and organization, and from the very intimate dependence of its members upon the people, which renders them liable to be peculiarly susceptible to popular clamor, is not properly constituted to try with coolness, caution, and impartiality a criminal charge, especially in those cases in which the popular feeling is strongly excited,--the very class of cases most likely to be prosecuted by this mode." By banning bills of attainder, the Framers of the Constitution sought to guard against such dangers by limiting legislatures to the task of rulemaking. "It is the peculiar province of the legislature to describe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments."

381 U.S. at 445-46 (quoting 1 Cooley, <u>Constitutional Limitations</u> 536-37 (8th ed. 1927), and <u>Fletcher</u>, 10 U.S. at 136, respectively).[25] Acting on this broad view of the Clause's role in

_____

[25]<u>See also</u> <u>Landgraf v. USI Film Prod.</u>, 511 U.S. 244, 267 n.20 (1994) (quoting <u>Richmond v. J.A. Croson Co.</u>, 488 U.S. 469, 513-14 (1989) (Stevens, J., concurring in part and concurring in the judgment)):

Legislatures are primarily policymaking bodies that promulgate rules to govern future conduct. The constitutional prohibitions against the enactment of ex post facto laws and bills of attainder reflect a valid concern about the use of the political process to punish or characterize past conduct of private citizens. It is the judicial system, rather than the legislative process, that is best equipped to identify past wrongdoers and to fashion remedies that will create the conditions that presumably would have existed had no wrong been committed.

31

the constitutional structure, Chief Justice Warren held that the law in question--making it a crime for a past or current member of the Communist Party to hold certain union positions with a potential to disrupt interstate commerce--was an unconstitutional bill of attainder:

> The statute does not set forth a generally applicable rule decreeing that any person who . . . possesses certain characteristics . . . shall not hold union office, and leave to courts and juries the job of determining what persons . . . possess the specified characteristics.  Instead, it designates in no uncertain terms the persons who possess the feared characteristics and therefore cannot hold union office without incurring criminal liability--members of the Communist Party.

Id. at 450.

The broad holding in Brown was not without its caveats, however, and to these we must turn in order to assess the precise role of punishment in the case.  In distinguishing § 32 of the Banking Act of 1933--providing that the officers, directors, and

---

and The Federalist No. 44, at 301 (James Madison) (J. Cooke ed. 1961):

> Bills of attainder, ex post facto laws, and laws impairing the obligation of contracts are contrary to the first principles of the social compact, and to every principle of sound legislation.  . . .  The sober people of America are weary of the fluctuating policy which has directed the public councils.  They have seen with regret and with indignation, that sudden changes and legislative interferences in cases affecting personal rights, become jobs in the hands of enterprizing and influential spectators; and snares to the more industrious and less informed part of the community.

employees of certain securities firms could not serve as officers, directors, or employees of member banks in the Federal Reserve System--from the statute at issue, the Court noted that:

> [The union law], unlike § 32 of the Banking Act, inflicts its deprivation upon the members of a political group thought to present a threat to national security. As we noted above, such groups were the targets of the overwhelming majority of English and early American bills of attainder. Second, § 32 incorporates no judgment censuring or condemning any man or group of men. In enacting it, Congress relied upon its general knowledge of human psychology, and concluded that the concurrent holding of the two designated positions would present a temptation to any man--not just certain men or members of a certain political party. Thus insofar as § 32 incorporates a condemnation, it condemns all men. . . . In designating bank officers . . . Congress merely expressed the [general] characteristics it was trying to reach in an alternative, shorthand way.

Id. at 453-54.

Thus, although Brown began with a fairly broad construction of the Clause, and thereby supplied SBC with a large portion of its argument in the instant case, it did not purport fully to abandon the prior development of the punitive element. As the above discussion makes clear, one of the key reasons that the Court found § 32 distinguishable was that it did not incorporate a "judgment censuring or condemning any man or group of men." Further, the Court explicitly left open the possibility of accomplishing non-punitive, prophylactic economic legislation by way of "shorthand" designations.

33

This latter theme was picked up one last time in <u>Nixon v. Administrator of General Services</u>, 433 U.S. 425 (1977), where the Court summarized and rationalized its extensive attainder jurisprudence and developed the most comprehensive analysis of the punishment prong that has been offered to date. In that case, the Court upheld a law that, as noted, directed Richard M. Nixon by name to turn over his presidential papers to the Administrator of General Services. After discussing why Nixon "constituted a legitimate class of one," <u>see</u> supra, note 12, the Court went on to explain that, even if the specificity element were deemed to be satisfied, it would still have to inquire whether Congress "'inflict[ed] punishment' within the constitutional proscription." 433 U.S. at 472-73 (quoting <u>Lovett</u>, 328 U.S. at 315). After examining the historical underpinnings of the Clause and noting that the statute at issue did not involve any of the traditional examples of "punishment" which had been held to implicate attainder analysis in the past--including death, imprisonment, banishment, punitive confiscation of property, and employment bars (as evidenced by <u>Cummings</u>)--the Court launched into a three-stage examination of general punitive character. <u>See</u> <u>id.</u> at 473-75. First, the Court noted that it "often has looked beyond mere historical experience and has applied a functional test of the existence of punishment, analyzing whether the law under challenge, viewed in terms of the

34

type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." See id. at 475 (citing Cummings, 71 U.S. at 319-320, Hawker, 170 U.S. at 193-194, and Dent, 129 U.S. at 128, among other cases). Because the protection of Nixon's presidential papers was unquestionably a legitimate, nonpunitive legislative purpose that the burdens imposed by the statute were well designed to further, the Court concluded that the law was nonpunitive under the functional approach. See id. at 476-78. Next, the Court looked to legislative purpose. Because there was no indication in the legislative history of a specific intent to punish--unlike in past cases like Lovett, where the House Report characterized the named individuals as "'subversive . . . and . . . unfit . . . to continue in Government employment'"--the Court concluded that this test also came out in favor of a nonpunitive finding. See id. at 478-80 (quoting Lovett, 328 U.S. at 312). Finally, the Court turned to the structure of the statutory provisions. Because it also evinced a nonpunitive quality to the legislation, by protecting, for example, Nixon's ability to access the papers himself and to raise claims of privilege with regard to them in court proceedings, the Court concluded that this test also indicated a nonpunitive character. See id. at 481-82. Because the statute did not "impose criminal penalties or other punishment," the

35

Court concluded that it was not a bill of attainder, regardless of its specificity.  Id. at 482 (quotations omitted).

2

In the light of the 400 years of case law and history that we have considered, we believe that Nixon stands, ultimately and concisely, for the following proposition: if legislation has a legitimately nonpunitive function, purpose, and structure, it does not constitute punishment for purposes of the Bill of Attainder Clause, even where it imposes the historically punitive sanction of barring designated individuals from engaging in certain professions. This statement is consistent with the older, traditional lines of analysis in the Court's attainder jurisprudence, including particularly the prophylactic exception developed in Cummings, Garland, Dent, Hawker, and Justice Frankfurter's concurrence in Lovett.  It is also not inconsistent with the more sweeping separation of powers theory espoused by Chief Justice Warren in his somewhat aberrant Brown opinion, at least to the extent that that case left open the possibility of using "shorthand" designations in otherwise proper categorical legislation.  Although some portions of Nixon might be read to suggest that historical punishments are "inherently suspect,"[26] we find this suggestion inapposite to the

---

[26]See id., 433 U.S. at 473 (noting that "the substantial experience of both England and the United States with such abuses of parliamentary and legislative power offers a ready checklist of

36

particular area of employment bars.  As <u>Nixon</u> makes clear, this type

of liability is only an "historical" punishment to the extent that

certain examples have been declared punitive in past cases like

<u>Cummings</u> and <u>Lovett</u>.   See <u>Nixon</u>, 433 U.S. at 474.   Because these

building blocks for the historical characterization themselves

contain the very seeds of the prophylactic exception, and because

<u>Nixon</u>'s "functional test" is rooted in that very exception as

developed in the employment bar cases of <u>Hawker</u>, <u>Dent</u>, and <u>Cummings</u>,

see <u>Nixon</u>, 433 U.S. at 475, it simply cannot be convincingly

maintained that employment bars are inherently historically punitive

without reference to <u>Nixon</u>'s other considerations.

More importantly, however, such a reading would contradict the

Supreme Court's own most recent recapitulation of the punishment

prong.  In <u>Selective Service</u>, the Court stated that:

> In deciding whether a statute inflicts forbidden
> punishment, we have recognized three necessary inquiries:
> (1) whether the challenged statute falls within the
> historical meaning of legislative punishment; (2) whether
> the statute, "viewed in terms of the type and severity of
> burdens imposed, reasonably can be said to further
> nonpunitive legislative purposes"; and (3) whether the
> legislative record "evinces a congressional intent to
> punish."

---

deprivations and disabilities so disproportionately severe and so
inappropriate to nonpunitive ends that they unquestionably have
been held to fall within the proscription of Art. I, § 9" and that
"[a] statutory enactment that imposes any of those sanctions on
named or identifiable individuals would be immediately
constitutionally suspect").

468 U.S. at 852 (quoting <u>Nixon</u>, 433 U.S. at 473, 475-76, & 478, respectively). Nothing in <u>Selective Service</u> suggests that the historical punishment test is ever dispositive on its own, or that it should be conducted without reference to the actual history underlying the sanction at issue, and we decline to read such a ritualistic and unsensible formulation into the Clause. <u>See also</u> <u>BellSouth</u>, 144 F.3d at 65 (stating that "[e]ven measures historically associated with punishment--such as permanent exclusion from an occupation--have been otherwise regarded when the nonpunitive aims of an apparently prophylactic measure have seemed sufficiently clear and convincing") (internal quotations omitted); <u>Dehainaut</u>, 32 F.3d at 1071 (stating that, "[e]ven where a fixed identifiable group . . . is singled out and a burden traditionally associated with punishment--such as permanent exclusion from an occupation--is imposed, the enactment may pass scrutiny under bill of attainder analysis if it seeks to achieve legitimate and nonpunitive ends and was not clearly the product of punitive intent").

3

Adapting the <u>Selective Service</u> formulation to this case in the light of our inquiries, the question becomes whether the Special Provisions, viewed in terms of the type and severity of burdens imposed and the expressed intent of Congress, reasonably can be said

38

to further nonpunitive legislative purposes such that the sanction at issue, a bar from participation in certain businesses, is neither historically nor functionally nor motivationally punitive. We can only conclude that they can, and therefore find that the Special Provisions are constitutionally sound.

First and perhaps foremost, we think that the Special Provisions are not punitive because they do not impose a perpetual bar on the BOCs' entry into any of life's avocations. In Cummings, Garland, and Lovett, the burdened individuals were barred from all future employment in certain professions based on immutable past acts. Under the Special Provisions, on the other hand, the BOCs will be allowed to enter each of the affected areas as soon as the statutory criteria regarding competition in their local service markets are met, and, in the case of information services, in 2001 regardless. As the Supreme Court expressly stated in Selective Service, "[a] statute that leaves open perpetually the possibility of [qualifying for some specifically denied benefit] does not fall within the historical meaning of forbidden legislative punishment." 468 U.S. at 853.[27]

---

[27]We recognize that meeting the competition criteria may not be an easy matter for the BOCs. Still, nothing in the statute or SBC's recent experiences with the FCC and the D.C. Circuit leads us to suspect that it will be impossible, and we are satisfied that the BOCs will be able to emerge from the restrictions when it is in their economic and business interest to meet the stiff criteria.

Second, we conclude that the Special Provisions are not punishment because they serve a nonpunitive purpose: attempting to ensure fair competition in the markets for local service, long distance, telecommunications equipment, and information services. Indeed, even under the MFJ, we do not understand that the line-of-business restrictions imposed on the BOCs were intended to have a punitive function. As Judge Greene stated, the restrictions were imposed because "[p]articipation in these fields carries with it a substantial risk that the Operating Companies will use the same anticompetitive techniques used by AT&T in order to thwart the growth of their own competitors." United States v. AT&T, 552 F.Supp. at 224. This rationale seems much more like a judgment "condemning all men" in certain inherently conflicted positions than an impermissible "judgment censuring or condemning any man or group of men" for their personal conduct, see Brown, 381 U.S. at 453-54, so to the extent that Congress was merely reimposing the MFJ, it did not engage in action derivatively punitive. Furthermore, the actual terms of the Special Provisions stay close to their legitimate ends. By clearly linking a lifting of the long distance and telecommunications equipment restrictions to competition in the BOCs' local markets, and by making the structural separation condition for entry into the nascent and vulnerable information services market temporary, Congress has tailored the burdens imposed

40

to an appropriate end of promoting competition. Finally, and although SBC has argued fervently to the contrary, the mere fact that the Special Provisions are limited in application to the BOCs (and thus do not cover other LECs with substantial local market power, like GTE) does not cast substantial doubt on the fit of this tailoring. As the D.C. Circuit has expressly recognized, "[b]ecause the BOCs' facilities are generally less dispersed than GTE's, they can exercise bottleneck control over both ends of a [long distance] telephone call in a higher fraction of cases than GTE" (or any of the other LECs, for that matter), and it is thus rational to subject them to additional burdens in order to achieve the overall goal of competitive local and long distance service. BellSouth, 144 F.3d at 67.

Third, we reason that the Special Provisions are not punitive because neither their terms nor their legislative history demonstrates the "smoking gun" evidence of punitive intent necessary to establish a bill of attainder. As the Supreme Court clarified in Selective Service, "'unmistakable evidence of punitive intent . . . is required before a Congressional enactment of this kind may be struck down'" on attainder grounds. Id., 468 U.S. at 856 n.15 (quoting Flemming, 363 U.S. at 619); cf. Lovett, 328 U.S. at 315 (for an example of such evidence). To be sure, there were some isolated references in congressional debate to the Bell

41

System's questionable business practices prior to the MFJ, which were offered as evidence of the general potential for abuse of local market power.  But, still, SBC has pointed us towards no indication that the Special Provisions were themselves enacted to punish the BOCs for past antitrust violations.  Instead, the legislative record is really quite clear that Congress--certainly as a whole--considered the Special Provisions to be just what they appeared to be: a prophylactic, compromise regulation of the BOCs' local market power to ensure greater competition in all of the nation's telecommunications markets.

Finally, and perhaps most fundamentally, we conclude that the Special Provisions are not punitive because they were part of a larger quid pro quo.  Combined with § 601(a)(1), the Special Provisions represent a hard-fought compromise on a massive issue of public policy which, in the end, contained both good and bad elements for the BOCs.[28]  For example, although the information

---

[28]See SBC Communications, 138 F.3d at 412:

> The question of how best to achieve [the goals of the Act] . . . was the subject of great debate.  Some thought that the local and long-distance markets should be open to all competitors immediately. Others believed that the BOCs should have to wait until actual competition was introduced in their local markets before providing interLATA service, since it was claimed that the long-distance market is already competitive. As might be expected for an issue of this economic significance, an extended lobbying struggle ensued.  The end product was a compromise between the competing factions.

services restriction lifted under the MFJ was partially reimposed under § 274, the BOCs were immediately freed, by operation of § 601(a)(1) and the other Special Provisions, from existing MFJ restrictions on their ability to offer incidental and out-of-region long distance service. More importantly, the Special Provisions gave the BOCs a clear delineation of what they needed to do to achieve a lifting of all the old MFJ restrictions in the future-- certainly a step up, from the BOCs' perspective, from being under Judge Greene's perpetual supervision. It is perhaps for this reason that the BOCs have apparently consistently represented, outside of litigation, that they were pleased with the Act. Indeed, in a public news release, SBC's Chairman lauded the Act as "landmark legislation" that would allow SBC "immediately [to] provide long-distance service outside [its] . . . region and to [its] cellular customers everywhere," and that created "clear and reasonable pathways" for SBC to obtain permission to provide in-region long distance service in the future--"pathways that [SBC was] happy with." The other BOCs made similar comments, and they clearly were effective in persuading Congress of their support for the Act. See 142 Cong. Rec. S393 (daily ed. Jan. 26, 1996) (remarks of Sen. Pressler) ("We now have the regional Bell companies supporting the bill and we have the long-distance companies supporting the bill. That is an unusual, rare moment in American history when the

43

regional Bells and long-distance companies are temporarily at peace, so to speak."); id. at S696 (daily ed. Feb. 1, 1996) (statement of Sen. Kerrey) (noting that the Act was "a very unusual piece of legislation in that the demand for it [wa]s coming from . . . the whole range of corporations; . . . RBOC's, long-distance, cable, broadcast; all of them"); id. at S699 (daily ed. Feb. 1, 1996) (statement of Sen. Lott) ("The telephone companies are supporting this legislation.  The long-distance companies are supporting this legislation--both of them would like to have a little more in their sections, but basically they know this is good legislation . . . .").  Be that as it may, it is at any rate clear that a legislative quid pro quo on this level simply cannot be punitive for attainder purposes.

For all of the foregoing reasons, we find that the Special Provisions ultimately are nonpunitive as an historical, functional, and motivational matter.  They are therefore not an unconstitutional and odious bill of attainder as that term has been defined by the Supreme Court.  To the extent that the district court concluded otherwise, it was in error, and its decision on that point is accordingly reversed.

B

As noted above, however, SBC and the other appellees also urge three additional constitutional arguments as alternate bases for

44

affirming the judgment of the district court.  Having found the Special Provisions not to constitute a bill of attainder, we must obviously consider these alternate theories.  We do so only briefly, however, as they are far less substantial.

1

The appellees first make two interrelated arguments that the Special Provisions violate the constitutional requirement of separation of powers--i.e., that the Special Provisions represent an arrogation to the legislative branch of powers functionally vested in the judicial branch by the very firmament of the Constitution.  See generally Plaut, 514 U.S. at 218-25 (noting, among other things, that "[t]he Framers of our Constitution lived among the ruins of a system of intermingled legislative and judicial powers" and felt a "sense of a sharp necessity to separate the legislative from the judicial" in designing their new system). Despite their strong institutional pedigree, neither argument has significant merit.

First, the appellees contend that the Special Provisions violate separation of powers because they address themselves to a particular judicial consent decree--the MFJ--in such a way as to alter the result.  They rely on the well accepted rule that it violates separation-of-powers principles for Congress to reopen any adjudication that represents the "final word of the judicial

45

department" on a case.  See Plaut, 514 U.S. at 225-27.  Yet under Pennsylvania v. Wheeling and Belmont Bridge Co., 59 U.S. (18 How.) 421 (1855), it has long been clear that Congress may change the law underlying ongoing *equitable* relief, even if, as in Wheeling itself, the change is specifically targeted at and limited in applicability to a particular injunction, and even if the change results in the necessary lifting of that injunction.  See id. at 429.  The only real question on this point would seem to be whether Wheeling survives the Court's more recent separation of powers jurisprudence, as recently recited in Plaut.  In that case, however, Justice Scalia could hardly have been more clear that "nothing in our holding today calls [Wheeling] into question."  Id., 514 U.S. at 232.

Obviously, Wheeling survives, as all of the circuit courts to consider separation-of-powers challenges to the Prison Litigation Reform Act of 1995 recently concluded.  In those cases the courts dealt with a statute, 18 U.S.C. § 3626(b)(2), that mandated the termination of certain existing consent decrees if they were not based upon a newly announced standard of factual findings.  In upholding this provision in the face of a separation-of-powers attack, five courts expressly held that Congress could interfere with ongoing consent decrees, because such decrees were not "final

judgments" for separation-of-powers purposes.[29]  Indeed, even the one court to strike down § 3626(b)(2) was forced to concede that "Wheeling established the principle that the state of the law at the time a final judgment embodying a permanent injunction is entered is not part of what is 'final' about the judgment."  Taylor v. United States, 143 F.3d 1178, 1182 (9th Cir. 1998) (Ristani, J.).

---

[29]See Dougan v. Singletary, 129 F.3d 1424, 1426 (11th Cir. 1997) (per curiam) ("As the Court explained in Plaut v. Spendthrift Farm, Inc., a true 'final judgment' here means not an appealable judgment, but one that represents the 'last word of the judicial department with regard to a particular case or controversy.' Consent decrees are final judgments, but not the 'last word of the judicial department.'"); Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 657 (1st Cir. 1997) (Selya, J.) ("Plaut and Wheeling Bridge, read together, teach that equity requires, and the separation of powers principle permits, legislatures to direct that courts respond to changes in substantive law by revisiting forward-looking injunctions."); Benjamin v. Jacobsen, 124 F.3d 162, 171 (2d Cir. 1997) (Calabresi, J.) ("In distinguishing Wheeling Bridge, the Plaut Court implicitly drew a similar distinction between two kinds of final judgments for separation of powers purposes--final judgments without prospective effects, which could not be constitutionally revised through legislation, and final judgments with prospective effects, whose effects could be constitutionally so revised."); Gavin v. Branstad, 122 F.3d 1081, 1087 (8th Cir. 1997) (Bowman, J.) ("Plaut does not hold that final judgments are invariably immune to congressional tinkering; what Plaut protects is 'the last word of the judicial department with regard to a particular case or controversy.' In a continuing case, a consent decree is not the last word of the courts in the case, even after the decree itself has become final for purposes of appeal."); Plyler v. Moore, 100 F.3d 365, 371 (4th Cir. 1996) (Wilkins, J.) ("[A]s made clear by the Court in Plaut, an attempt to alter legislatively a legal judgment violates the separation-of-powers doctrine. A judgment providing for injunctive relief, however, remains subject to changes in the law. These principles apply equally to consent decrees and litigated judgments.") (citations to Wheeling and other cases omitted).

47

Despite this great weight of authority, the appellees counter that the congressional interference in this case is more suspect, because it is so specific. Yet, as noted, the legislation in Wheeling was rife with specificity: the change effected by Congress was specifically directed at altering the legal status of a single, named bridge in order to change the result of a particular injunction. See id., 59 U.S. at 429. Specificity was also manifestly evident in the more recent related case of Robertson v. Seattle Audubon Society, 503 U.S. 429, 434-35, 437-40 (1992), where Justice Thomas, writing for a unanimous Court, found no separation-of-powers problem in a statute that changed the law with respect to two pending lawsuits identified by name and caption number. In the light of all these precedents, we simply cannot see a separation-of-powers problem based on the Special Provisions' interference with the MFJ in this case.

That leaves the second line of attack, which, as we understand it, is a not-too-well-defined argument that all of the problematic aspects of the Special Provisions--including particularly their specificity, their interference with the MFJ, and the near-punitive nature of the liability they impose--when added together somehow amount to a separation-of-powers violation that is greater than the sum of its parts. Although this argument finds appealing rhetorical support in the more sweeping statements of some of the Court's older

48

cases, including particularly the admonition offered by Justice Marshall in <u>Fletcher</u> and seconded by Chief Justice Warren in <u>Brown</u> that "[i]t is the peculiar province of the legislature to describe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments," see <u>Brown</u>, 381 U.S. at 446, it is squarely and specifically contradicted by <u>Plaut</u>. In that case, Justice Breyer raised a very similar argument in his one-vote concurrence. See <u>id.</u>, 514 U.S. at 241-46. Justice Scalia's six-vote majority opinion soundly rejected it, however, noting (in addition to the above-quoted statement from footnote nine) that:

> The nub of th[e] infringement consists not of the Legislature's acting in a particularized and hence according to the concurrence) nonlegislative fashion; but rather of the Legislature's nullifying prior, authoritative judicial action. It makes no difference whatever to that separation-of-powers violation that it is in gross rather than particularized . . . or that it is not accompanied by an "almost" violation of the Bill of Attainder Clause, or an "almost" violation of any other constitutional provision.

See <u>id.</u> at 239 & n.9. In the light of <u>Plaut</u>, there is thus no viability to the "amorphous" theory either, and the appellees' separation-of-powers challenge in this case must fail.

2

The appellees next argue that the Special Provisions violate the Equal Protection Clause by discriminating against the BOCs by name. Under <u>City of New Orleans v. Dukes</u>, 427 U.S. 297 (1976),

49

however, specification of named parties in economic regulation is clearly permissible for equal protection purposes so long as the regulation is rationally related to a legitimate governmental interest and does not trammel fundamental personal rights or draw upon inherently suspect distinctions such as race, religion, or alienage. Id. at 304-06. As should be manifest from the entire history of this area of the law, regulation of an LEC's conduct in the local telephone service market neither restricts fundamental individual rights nor lacks rational relation to the government's legitimate interest in ensuring greater competition in all telecommunications markets. Furthermore, the specification of the BOCs in the Special Provisions at issue here was not based on invidious criteria like race, religion, or alienage. As such, the Special Provisions are not inconsistent with the Equal Protection Clause.

3

Finally, the appellees urge that, even if the other Special Provisions are allowed to stand, § 274 must go as it impermissibly infringes the BOCs' right to free speech. The D.C. Circuit recently rejected an identical challenge to § 274 by another RBOC, however, see BellSouth, 143 F.3d at 67-71, and we can find no reason to disagree with its result and analysis. Because § 274 does not in any way differentiate speech on the basis of content, its speech

50

restricting provisions are subject only to (at most) intermediate scrutiny review under Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 642 (1994) (Turner I). Under that standard, a restriction will be upheld "if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." Turner Broadcasting System, Inc. v. FCC, 117 S.Ct. 1174, 1186 (1997) (Turner II). Obviously, the competition-enhancing interests discussed above are manifestly sufficient to meet the first hurdle. Furthermore, because § 274 merely imposes a structural separation requirement on speech activities, not an absolute bar, its restrictions are practically de minimis in this necessarily corporate context, and certainly do not burden substantially more speech than necessary to accomplish its legitimate goals. For these reasons, the contention that § 274 violates the BOCs' right to free speech is entirely lacking in merit.

V

In the end, the constitutional prohibition against bills of attainder is a specific rather than a general guaranty of rights. Cf. Lovett, 328 U.S. at 321 (Frankfurter, J., joined by Reed, J., concurring [in the judgment]). Nothing in the Court's jurisprudence should be read to allow that specific guaranty wholly to escape the

51

implications of its historical origins, and since the age of Blackstone and before, it has been clear that for a bill to attaint, it simply must invoke the punitive.  In this case, that has not occurred.  Although the Special Provisions may well constitute a legislative judgment that the BOCs currently have an inherent and natural potential to restrain competition by virtue of their local market power, the Act does not declare them monsters or otherwise seek to punish them on the basis of past conduct, and thus does not run afoul of the Bill of Attainder Clause.  Because the Constitution's additional requirements of separation of powers, equal protection of the laws, and free speech are also not even arguably infringed by the Act, the judgment of the district court is accordingly

R E V E R S E D.[30]

---

[30]We are unable to see this case in the single-minded terms expressed in the dissenting opinion.  We have faithfully, to the best of our ability, recounted the sinuous journey of bills of attainder from the earliest days to the present day.  Like a Christmas pie, these cases--as a whole and indeed individually-- provide a little something for every taste, and are rich with selective quotes to support a chosen conclusion.  In arriving at our conclusions, we have tried to synthesize these diverse expressions and applications of the bill of attainder clause in order to apply it in this context of business regulation--its first such application.  What we think the dissenting opinion has not observed in its straightforward stride is that attainder requires an element of punishment.  There are employment bars and there are employment bars--some of the same character, others of a different character.  A non-perpetual legislative bar, which forbids only a corporation's participating in a particular segment of the general business in which the corporation is engaged is not punishment when

that bar is enacted for nonpunitive appropriate legislative purposes under conditions to which that business effectively has agreed.  Indeed, we are not sure the dissent is otherwise convinced given its acknowledgment that there is no real "victim" of Congress in this case.

JERRY E. SMITH, Circuit Judge, dissenting:

En route to minting a "regulatory exception" to the Bill of Attainder Clause, the majority holds that punishment is not punishment when it is inflicted with a "prophylactic" intent. The majority reaches this cherished goal by stitching together a patchwork of concurrences and dissents and by brushing aside binding Supreme Court majority opinions as "aberrant" and "unsensible." I respectfully dissent.

## I.

The Telecommunications Act of 1996 singles out twenty named corporations for severe line-of-business restrictions characterized, in the Act's telling language, as the "Special Provisions." This case hinges on whether these economic restrictions, which bar the named firms from lucrative telecommunications markets, amount to legislative "punishment" as historically understood.

### A.

The Supreme Court has consistently held that bars to employment constitute punishment for purposes of the Bill of Attainder Clause. In one of the earliest bill of attainder cases, *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 320 (1866), the Court observed that

"[d]isqualification from the pursuits of a lawful avocation . . . may also, and often has been, imposed as punishment." The Court struck down, as a bill of attainder, a provision in the Missouri Constitution prohibiting Confederates or their sympathizers from holding certain jobs. The Court recognized that "in the pursuit of happiness all avocations, all honors, all positions, are alike open to every one, and that in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct is punishment, *and can be in no otherwise defined*." *Id*. at 321-22 (emphasis added).

The law has not changed. In *Ex parte Garland*, 71 U.S. (4 Wall.) 333 (1866), the Court applied *Cummings*'s reasoning to strike down, as a bill of attainder, a federal statute barring Confederates from practicing in the federal courts. More recently, in *United States v. Lovett*, 328 U.S. 303 (1946), the Court reaffirmed the principle that line-of-work restrictions are inherently punitive, invalidating a federal statute terminating the salaries of three named federal employees. And in *United States v. Brown*, 381 U.S. 437 (1965), the Court once again held that a statute proscribing entry into a certain line of work constituted punishment, striking down a federal statute that forbade members of the Communist Party from serving as labor union officials.

Any doubt that employment bars fall squarely within the historical conception of punishment was erased by the Court's two most recent bill of attainder cases. In *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 474 (1977), the Court canvassed the various burdens historically deemed punitive, concluding that "[o]ur country's own experience with bills of attainder resulted in the addition of another sanction to the list of impermissible legislative punishments: a legislative enactment barring designated individuals or groups from participation in specified employments or vocations . . . ."

The Court's latest pronouncement, in *Selective Serv. Sys. v. Minnesota PIRG*, 468 U.S. 841 (1984), echoes *Nixon*: "In our own country, the list of punishments forbidden by the Bill of Attainder Clause has expanded to include legislative bars to participation by individuals or groups in specific employments or professions." 468 U.S. at 852. Indeed, employment bars "have constituted the most common sort of statutes struck down by the Court as unconstitutional bills of attainder." *BellSouth Corp. v. FCC*, 144 F.3d 58, 72-73 (D.C. Cir. 1998) (Sentelle, J., dissenting) (citing *Selective Service*, 468 U.S. at 852).

The majority's ancillary argument that "the Special Provisions are not punitive because they do not impose a perpetual bar" is meritless. The majority quotes *Selective Service*, 468 U.S. at 853,

which states that "[a] statute that leaves open perpetually the possibility of [qualifying for some specifically denied benefit] does not fall within the historical meaning of forbidden legislative punishment" (brackets added by majority).  But in *Brown*, the Court had already considered and rejected the majority's escapability argument, explaining:

> We do not read [two prior cases] to have set up inescapability as an absolute prerequisite to a finding of attainder.  Such an absolute rule would have flown in the face of explicit precedent, *Cummings v. Missouri*, 4 Wall. 277, 324, as well as the historical background of the constitutional prohibition.  A number of ante-Constitution bills of attainder inflicted their deprivations upon named or described persons or groups, but offered them the option of avoiding the deprivations, e.g., by swearing allegiance to the existing government.

381 U.S. at 457 n.32.  This illustrates that the Bill of Attainder Clause cannot be avoided simply by inserting into the statute a means of escape.  The fact that the federal government holds the key to the Baby Bells' prison is irrelevant.

B.

Faced with the unhappy reality of well over a century of Supreme Court cases holding that employment bars constitute punishment, the majority announces the discovery of a heretofore unrecognized exception to the Bill of Attainder Clause:  the "prophylactic exception."  Apparently this creature awakens only in

57

cases such as thisSSwhen Congress punishes, but acts with a beneficent, regulatory intent.

The method through which the majority traces the evolution of the "prophylactic exception" reveals its suspect pedigree. The exception's origin is said to lie in Justice Miller's dissent in *Garland*, where he suggested that the employment bar at issue was not punitive because Congress did not intend it as such. Rather, Justice Miller argued, the statute should properly be viewed as a prophylactic measure, because Congress merely sought to protect the public from the *future* misdeeds of the attainted individuals. *See* 71 U.S. (4 Wall.) at 393-96 (Miller, J., dissenting).

This theory, rejected by the *Garland* majority, was purportedly adopted some decades later in *Dent v. West Virginia*, 129 U.S. 114 (1889), and *Hawker v. New York*, 170 U.S. 189 (1898). Unlike most of the authorities the majority relies on to support the prophylactic exception, *Dent* and *Hawker* are *majority* opinions. But they have little to say about this case: The statute at issue in *Dent* did not single out individuals for punishment, but concerned a state's generally applicable licensing requirements; similarly, the burden in *Hawker* was imposed on a class rather than named individuals. In any event, no subsequent case has interpreted *Dent* and *Hawker* the way the majority does hereSSas authorizing

congressional punishment of individuals as long as the statute can be said to prevent future harms.

The cornerstone of the majority's theory is Justice Frankfurter's concurrence in *Lovett*, 328 U.S. at 318. Although Justice Frankfurter distinguished between "harm [that is] inflicted by government authority" and "punishment," *id*. at 324 (Frankfurter, J., concurring), the majority of the Court refused to embrace this view. *Cf. Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 66 (1996) (holding that a minority opinion is "of questionable precedential value, largely because a majority of the Court expressly disagreed with the rationale of the plurality"). Rather than adopt Justice Frankfurter's narrow reading of the Bill of Attainder Clause, the Court majority held that the challenged law, which terminated the salaries of three named federal employees, "'operates as a legislative decree of perpetual exclusion' from a chosen vocation" and therefore "clearly accomplishes the punishment of named individuals without a judicial trial." *Lovett*, 328 U.S. at 316 (quoting *Garland*, 71 U.S. (4 Wall.) at 377). The majority quite plainly equated employment bars with punishment.

Finally, *Brown* and *Nixon* foreclose any suggestion that the full Court subsequently adopted Justice Frankfurter's minority view. *Brown*, which the panel majority cryptically claims "did not purport fully to abandon the prior development of the punitive element,"

concluded that the employment restriction at issueSSbarring members of the Communist Party from holding certain jobsSSamounted to punishment. The Court surveyed its bill of attainder jurisprudence and, relying on *Garland* and *Lovett*, held that the statute "plainly constitutes a bill of attainder" because "it designates in no uncertain terms the persons who possess the feared characteristics and therefore cannot hold union office . . . ." 381 U.S. at 449, 450.

*Nixon* is even more direct. There, the Court explained that "legislative enactment[s] barring designated individuals or groups from participation in specified employments or vocations" are "impermissible" and "unquestionably have been held to fall within the proscription of Art. I, § 9." 433 U.S. at 473, 474. This stark language leaves little room for the majority's "prophylactic exception": Impermissible is impermissible. Once a court determines that Congress has imposed a burden historically deemed punitive, such as the employment bar at issue here, that is the end of the analysis. The majority protests that such a reading of *Nixon* is "ritualistic and unsensible," but it is difficult to squeeze a prophylactic exception out of the Court's statement that "[a] statutory enactment that imposes [an employment bar] on named or identifiable individuals would be *immediately constitutionally suspect*." *Id*. at 473 (emphasis added).

Moreover, to the extent the Court considered congressional purpose in passing the law, it did so only after it had determined that the challenged burden did not fit the historical definition of punishment; its consideration of legislative intent was a means of ensuring that "new burdens and deprivations [are not] legislatively fashioned that are inconsistent with the bill of attainder guarantee."  *Id*. at 475.

The Court began its analysis by asking whether the burden§§the confiscation of presidential records§§fell into the category of "immediately suspect" punishments, such as a bar to employment. After concluding that President Nixon "cannot claim to have suffered any of these forbidden deprivations at the hands of Congress," the Court remarked that "our inquiry is not ended by the determination that the [statute] imposes no punishment traditionally judged to be prohibited by the Bill of Attainder Clause." *Id*. at 475.  *Only then* did the Court turn to legislative purpose§§an inquiry that would not have been necessary if President Nixon *had* suffered one of the "forbidden" deprivations.

The *Selective Service* Court clarified this point.  It explained:

> Our inquiry does not end with a determination that [the statute] does not inflict punishment in its historical sense.  To ensure that the Legislature has not created an impermissible penalty not previously held to be within the proscription against bills of attainder, we

must determine whether the challenged statute can be reasonably said to further nonpunitive goals.

468 U.S. at 853-54 (citing *Nixon*, 433 U.S. at 475-76).

The majority's reading of these cases is sadly ironic.  In both *Nixon* and *Selective Service*, the Court sought to *expand* the protections of the Bill of Attainder Clause by looking to legislative purpose.   The Court's concern was congressional creativity in dreaming up new burdens that fell outside the category of burdens historically deemed punitive; by considering legislative intent, the Court erected an *additional* safeguard to protect individuals from new types of congressionally-devised punishment.

The majority's interpretation, by contrast, *contracts* the scope of the clause.  The majority looks to legislative intent not to protect citizens from congressional overreaching, but as a means of empowering Congress to pass punitive laws it could not otherwise enactSSsimply by claiming an intent to "regulate" rather than punish.   Thanks to the prophylactic exception, Congress may now single out individuals for punishments that were, until today, routinely held unconstitutional.

C.

In deeming nonpunitive a burden that the *Nixon* Court characterized as "unquestionably" punitive, 433 U.S. at 473, the

majority reasons that punishment is not really punishment if it is inflicted for preventive purposes.  The majority concludes that "[a]lthough the Special Provisions may well constitute a legislative judgment that the BOCs currently have an inherent and natural potential to restrain competition by virtue of their local market power, the Act does not declare them monsters or otherwise seek to punish them on the basis of past conduct, and thus does not run afoul of the Bill of Attainder Clause."  The majority distinguishes between retribution (the imposition of a burden for wrongful past conduct) and prevention (the imposition of a burden to reduce the likelihood of future harmsSShere, antitrust violations).

This distinction is flatly contradicted by *Brown*, which rejects such a cramped view of punishment and undermines the majority's novel interpretation of the clause.  In holding that an employment bar constituted punishment, even when imposed for prophylactic purposes, the Court explained:

> It would be archaic to limit the definition of "punishment" to "retribution." Punishment serves several purposes:  retributive, rehabilitative, deterrentSSand preventive.  One of the reasons society imprisons those convicted of crimes is to keep them from inflicting future harm, but that does not make imprisonment any the less punishment.

> Historical considerations by no means compel restriction of the bill of attainder ban to instances of retribution. A number of English bills of attainder were enacted for preventive purposesSSthat is, the legislature made a judgment, undoubtedly based largely on past acts and

> associations . . . that a given person or group was
> likely to cause trouble (usually, overthrow the
> government) and therefore inflicted deprivations upon
> that person or group in order to keep it from bringing
> about the feared event.

381 U.S. at 458-59.

Consider a statute that sentences to death a named individual who announces that he has criminal tendenciesSSbut has yet to commit a crime. Under the majority's theory, this law is not a bill of attainder: It does not "seek to punish on the basis of past conduct," and it serves a legitimate prophylactic function. This hypothetical illustrates the impossibility of confining the clause's protections to retributive measures. As the Court explained, a burden is rendered no less punitive by being based on future, rather than past, wrongdoing.

In fact, the majority's concession that "the Act may well constitute a legislative judgment that the BOCs currently have an inherent and natural potential to restrain competition" falls squarely within the Court's description of a bill of attainder: when "the legislature [makes] a judgment . . . that a given person or group [is] likely to cause trouble . . . and therefore [inflicts] deprivations upon that person or group in order to keep it from bringing about the feared event." *Id*. at 458-59. Here, Congress made a legislative judgment that the BOC's were likely to cause troubleSSthey were likely to commit antitrust violationsSSand

inflicted deprivations (severe line-of-business restrictions) in order to keep the Baby Bells from bringing about the feared event. Accordingly, under a straightforward application of *Brown*, the "prophylactic exception" is a chimera, and the Special Provisions are a bill of attainder.

## D.

In sum, the unbroken line of Supreme Court precedent compels the conclusion that the Special Provisions, because they impose an employment bar, constitute historical punishment forbidden by the Bill of Attainder Clause. The Court has never held that Congress can single out named individuals for burdens historically deemed punitive simply because legislators are animated by a well-meaning, regulatory spirit. Yet that is precisely what the majority holds today, sidestepping the *Nixon* Court's statement, 433 U.S. at 473, that this type of law is "immediately constitutionally suspect."

## II.

The Bill of Attainder Clause has long been regarded as protecting unpopular individuals or groups from trial-by-legislature. As the Court explained in *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966), the clause protects those "who are peculiarly vulnerable to nonjudicial determinations of guilt."

A quick survey of the caselaw confirms this view: The clause has been invoked to rescue Confederates and Communists from congressional wrath.

And that is what makes the Bill of Attainder analysis so unusual in this context: The Baby Bells, represented by armies of lawyers and lobbyists, hardly fit anyone's notion of a helpless victim. Moreover, there is evidence in the record that the Baby Bells, by their own account, *prevailed* in the legislative process. While their apparent consent to the Special Provisions does not estop them from challenging the restrictions in this court, it certainly undercuts their claim to victimhood. As the majority notes, the Special Provisions were part of a larger *quid pro quo*.

But the Bill of Attainder Clause serves a dual purpose: Not only does it rescue individuals from trial-by-legislature, it also preserves the separation of powers. The clause is a check on Congress's power to legislate; it forbids Congress from passing punitive laws that target individuals. Congress may, of course, pass laws conferring *benefits* on individuals, *see Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 n.9 (1995), but when it wishes to impose punishment, it must legislate in general terms and allow the judicial branch to decide which individuals have violated the laws and must be punished.

The Court explained the clause's role in preserving the separation of powers most thoroughly in *Brown*§§an opinion the panel majority tars as "somewhat aberrant." The Court began its discussion by reviewing the history of the clause, describing it as a barrier "to ensure that the legislature would not overstep the bounds of its authority and perform the functions of the other departments." 381 U.S. at 444 (emphasis omitted). It then stated precisely why the statute, which imposed an employment bar on members of the Communist Party, violated the clause:

> In [enacting the statute] Congress has exceeded the authority granted it by the Constitution. The statute does not set forth a generally applicable rule decreeing that any person who commits certain acts or possesses certain characteristics (acts and characteristics which, in Congress' view, make them likely to initiate political strikes) shall not hold union office, and leave to courts and juries the job of deciding what persons have committed the specified acts or possess the specified characteristics. Instead, it designates in no uncertain terms the persons who possess the feared characteristics . . . .

*Id*. at 450.

The Court noted that Congress was free to pass laws weeding subversives out of the labor movement§§only it had to do so through generally applicable legislation, otherwise it overstepped its constitutional bounds. In language directly applicable to the instant case, the Court explained that Congress "cannot specify the people upon whom the sanction it prescribes is to be levied. Under

our Constitution, Congress possesses full legislative authority, but the task of adjudication must be left to other tribunals." *Id*. at 461.

*Brown* stands for the idea that the Bill of Attainder Clause protects not only individual liberty, but also the other branches of government. The clause, in other words, helps ensure that Congress does not encroach on the executive's or judiciary's turf. As the Court concluded, *id*. at 442, "the Bill of Attainder Clause was intended not as a narrow, technical (and therefore soon to be outmoded) prohibition, but rather as an implementation of the separation of powers, a general safeguard against legislative exercise of the judicial function."

This is hardly a novel, twentieth-century interpretation. In one of the earliest bill-of-attainder cases, *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 136 (1810), Chief Justice Marshall explained that "[i]t is the peculiar province of the legislature, to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments." In fact, this understanding predates even the Marshall Court:

> Writings contemporary with the drafting of the
> Constitution express great concern lest the legislature
> assume the power to implement the total policy of
> government without the participation of the other
> branches, and support the thesis that the bill of

> attainder clause should be viewed as a limitation on
> legislatures fully as broad, and as necessary to the
> effective separation of powers, as that which has been
> imposed upon courts by article III.

Note, *The Bounds of Legislative Specification: A Suggested Approach to the Bill of Attainder Clause*, 72 YALE L.J. 330, 343 (1962) (cited with approval in *Brown*, 381 U.S. at 457 n.32).  In this sense, even if the BOC's somehow "consented" to Congress's imposing the Special Provisions, that consent is as irrelevant as is a litigant's "consenting" to subject-matter jurisdiction.  Congress simply lacks the power to legislate in this way.

In enacting the Special Provisions, Congress adjudicated.  It not only specified the sanction but also identified the specific corporations upon whom the sanction was to be leviedSSnot coincidentally, the same corporations involved in the prior AT&T litigation.  The Bill of Attainder Clause says that when Congress wishes to impose certain burdens historically deemed punitive, it can do so only through laws of general applicability.  The actual *application* of these laws to specific parties must be left to the other branches of government.  Congress runs afoul of the Bill of Attainder Clause when it enacts punitive legislation that targets certain entitiesSSeven where, as here, the punishment comes cloaked in the mantle of prophylactic economic regulation.

III.

The majority today opens a loophole in the Bill of Attainder Clause, allowing Congress to pass legislation that historically has been held unconstitutional.  In doing so, the majority redefines our traditional understanding of the clause's mandate:  Congress cannot single out an individual and deprive him of his life, liberty, or freedom to work.  Because the Telecommunications Act's "Special Provisions" amount to a bill of attainder, I respectfully dissent.